IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TODD LaVOY,

             Petitioner,

v.                                                   CIV 03-765 MCA/KBM

PATRICK W. SNEDEKER, Warden, et al.,

             Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on Todd LaVoy's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *E.g., Miller v. Mullin,* ___ F.3d ___, 2004 WL 96739 at *3 (10th Cir. 2004). All of the issues can be resolved on the record and, therefore, an evidentiary hearing is unnecessary. *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 531 U.S. 835 (2000); Rule 8(a), *Rules Governing Habeas Corpus Under Section 2254.*

I previously ordered Respondents to file the record proper. It is apparent that this is the first time that the actual transcripts and tapes in this matter have been consulted, and the entire state record has been thoroughly reviewed several times. I find that although none of the issues are procedurally-defaulted, the State's motion to dismiss should be granted because some of the claims are not cognizable and the remaining claims are without merit. Accordingly, I recommend that LaVoy's § 2254 petition dismissed with prejudice.

# I.  Overview

Petitioner, who was homeless at the time of the crime, confessed to hitting another homeless man with a rock, but maintained that he acted in self defense and in defense of his girlfriend, "Ruthie."[1]  The victim, "Stoney,"[2] died from his injuries.  *See e.g., Record Proper* at 213-19.  Petitioner was charged with one count of second-degree murder.  The jury convicted him pursuant to instructions that the State had to prove beyond a reasonable doubt that LaVoy did not act as a result of provocation, or in defense of himself or Ruthie.  *See id.* at 15, 132, 182.  Having found Petitioner to be a habitual offender, trial judge Lourdes A. Martínez,[3] sentenced him to serve a total of eighteen years.  *See id.* at 192.

On direct appeal, where Petitioner was represented by counsel, the New Mexico Court of Appeals affirmed, and the New Mexico Supreme Court denied certiorari.  *See Doc. 11,* Exhibits F-H.[4]  Petitioner unsuccessfully pursued state habeas relief *pro se.  See Exhibits.* I-L.  He then timely filed this federal petition where he raises sixteen claims, including a multi-faceted ineffective assistance of counsel claim.  *See Doc. 1.*  Respondents filed their Answer and a motion to dismiss, where they contend that some of the claims are procedurally-defaulted, some claims are not cognizable in federal habeas, and all of the claims are without merit.  *See Docs. 11-13.*

---

[1]  Her name was Francesca Stricker.  To avoid confusion, I refer to her as "Ruthie."

[2]  His name was Charles Sandbourne.  To avoid confusion, I refer to him as "Stoney."

[3]  Judge Martínez is a Magistrate Judge with this Court, having taken the bench on April 1, 2003.

[4]  Hereinafter, unless otherwise noted, all references to Exhibits are those attached to Respondents' Answer.  *See Doc. 11.*

# II.  Preliminary Considerations

## A.  *None Of The Claims Are Procedurally-Defaulted*

Respondents argue that Petitioner procedurally-defaulted certain claims by failing to raise

them in the trial court or on direct appeal.  *See Doc. 13* at 1-2.  However, as Respondents

acknowledge, LaVoy did raise these claims in his state habeas petition.  *Id.; see also Exhibit I.*

The state court did not rely on any procedural default in denying the claims.  Instead, it

entertained and cursorily and/or summarily addressed all of the claims on the merits.  *See Exhibit.*

*J.*

A federal habeas court "may not consider issues raised in a habeas petition that have been

defaulted in state court on an independent and adequate procedural ground, unless the petitioner

can demonstrate cause and prejudice or a fundamental miscarriage of justice."  *Medlock v. Ward,*

200 F.3d 1314, 1323 (10th Cir.) (internal quotations omitted), *cert. denied,* 531 U.S. 882 (2000).

For a state procedural rule to constitute an "independent" ground for federal habeas purposes,

however, the state courts must enforce the default.  As such, a federal habeas court cannot decline

to address a claim if the state court did not "clearly and expressly" base its decision on the

procedural bar.  *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).[5]  The state court did not do

---

[5]  *See also e.g., English v. Cody,* 146 F.3d 1257, 1259 (10th Cir. 1998) ("A state procedural
ground is independent if it relies on state law, rather than federal law, as the basis for the decision.");
*Jackson v. Shanks,* 143 F.3d 1313, 1319 (10th Cir.) ("Although the state argues that Mr. Jackson's claim
of ineffective assistance is nevertheless barred because he failed to raise the issue in his first state habeas
petition . . . the state court's denial of his second state habeas petition was not based on that procedural
ground.  We are not inclined to rely on a state procedural rule that the New Mexico courts did not rely
upon."), *cert. denied,* 525 U.S. 950 (1998); *Vernon v. Williams,* 2000 WL 286157 (10th Cir.) (conclusory
state ruling that could have been construed as on procedural ground and alternatively on merits found not
"independent"), *cert. denied,* 531 U.S. 1039 (2000); *compare Lopez v. Williams,* 59 Fed. Appx. 307 (10th
Cir. 2003) ("Here, the state court summarily rejected Lopez's federal claim because he failed to satisfy an

so here and, accordingly, I do not find any of the claims are procedurally-defaulted.

## B. Certain Claims Are Not Noncognizable In This Federal Habeas Proceeding

### (1) Claim 16 – Access To The Courts

Both at the state habeas level and here Petitioner claims he is being denied access to the courts due to deficiencies in the materials available to him at prison libraries and lack of access to the state court record. *Doc. 1* at 10G-10H; *see also Doc. 19* at 3-5; *Doc. 18* at 13-15; *Exhibit I* at 2N-2O. Access to the court claims are not cognizable as a grounds for habeas relief and instead must be pursued in separate civil action under 42 U.S.C. § 1983. *E.g., United States v. Brittain,* 41 Fed. Appx. 246, 249 n.2 (10th Cir.), *cert. denied,* 537 U.S. 913 (2002).

Moreover, any such suit by LaVoy would be unavailing. As demonstrated by the remainder of these proposed findings, Petitioner has no such claim because he cannot establish that the alleged denial of legal resources has hindered his efforts to pursue a nonfrivolous claim in challenging his conviction and sentence. *E.g., Lewis v. Casey,* 518 U.S. 343, 353 (1996).

### (2) Claim 15 – Petitioner Does Not Challenge A Forfeiture Of Earned "Good Time" Credits, And His Claim Regarding Computation Does Not Implicate A Liberty Interest Or, At Best, Is Premature

The New Mexico "good time" statute prior to 1999 permitted a credit of up to thirty days per month, and specifically applied to "both the basic sentence to be served and any enhanced term of imprisonment." N.M. STAT. ANN. § 33-2-34(A), (C) (Michie 1998). As of July 1, 1999, the legislature repealed that statute and substituted another. In pertinent part, for those who commit "a serious violent offense," the new statute limits good time credits to a maximum of four

---

independent state predicate – he did not preserve the issue at trial. The state court's preservation requirement, a non-merits predicate to its rejection of Lopez's federal claim, is plainly an independent state ground that implicates procedural-bar principles on federal habeas.").

days per month.  Persons convicted of nonviolent offenses still qualify for up to thirty days per month.  The new statute does not distinguish between a basic and enhanced sentence.  Indeed, the new statute does not mention enhancement whatsoever.  *See* N.M. STAT. ANN. § 33-2-34 (A)(1)-(2) (Michie Cumulative Supp. 2003).  Neither does the applicable regulation.  *See Exhibit O.*

The new statute applies prospectively only.  *See id.* (applicability notes; "applicable to persons convicted of a criminal offense committed on or after July 1, 1999 . . . as to persons convicted of a criminal offense committed prior to July 1, 1999, the laws with respect to meritorious deductions in effect at the time to offense was committed shall apply.").  It also specifically defines second degree murder as a "serious violent offense."  *Id.,* § 33-2-34(L)(4)(a).  The statute has been held constitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  *See State v. Morales,* 131 N.M. 530, 39 P.2d 747 (N.M. Ct. App.), *cert. denied,* 131 N.M. 738, 42 P.3d 843 (N.M. 2002).

Because the crime and sentence at issue here occurred in 2000 and 2001, respectively, when the trial judge sentenced Petitioner, she made specific findings concerning whether his offense was violent.  She sentenced Petitioner to fifteen years imprisonment on the murder count, enhanced by eight years imprisonment for being a habitual offender, for a total of twenty-three years.  *Record Proper* at 191-92.  She suspended five years for the sentence bringing his actual prison term to eighteen years.  Finding second degree murder to be a violent crime under § 33-2-34, she noted in the judgment "therefore, the Defendant's meritorious deductions shall not exceed a maximum number of four (4) days per month of time served."  *Id.* at 192.

LaVoy's "Good Time Figuring Sheet" shows that he is receiving his four-day allotment.  *See Exhibit M.*  He does not contend that any of these earned credits have been impermissibly

forfeited. *E.g., Wolff v. McDonnell,* 418 U.S. 539, 557 (1973); N.M. STAT. ANN. § 33-2-36 (Michie Cumulative Supp. 2003) (providing that earned good time credits can be forfeited for misconduct violations). Rather, he believes his good time credits will not be properly calculated because New Mexico no longer distinguishes between the basic sentence and the habitual offender portion.[6]

His arguments are easier to understand by reference to the claim as he described it to the state court in his habeas proceedings. There, he asserted his trial and appellate attorneys informed him that under the new good time statute he would end up serving 85% of his basic sentence and 50% of the enhancement. He contended that their statements created a "liberty interest" in having his sentence calculated under those terms. LaVoy asserted that upon transfer to the Lea County facility, he discovered that prison officials did not distinguish between the basic portion and the enhanced portion of his sentence. Instead, they considered them as one sentence to which the statutory four-day reduction (or 85% in Petitioner's view) would apply.

LaVoy maintains that the portion of the pre-1999 statute recognizing a distinction between the basic and enhanced portions of a sentence, created a "liberty interest" in maintaining the distinction, an interest to which he is entitled. Both there and here he maintains that because

---

[6]   In his federal petition, LaVoy asserts that the

> personnel at Lea County Correctional Facility have verbally informed Petitioner his computation of [good time] deductions are to be more restrictive than 1) allowed in the past, 2) allowed at State Facility, 3) explained at sentencing and through the Public Defender Department. Petition[er] has requested written explanation or direction, verbal or written, to a basis of this decision, (i.e., statute, policies, memorandums) but has receive no information.

*Doc. 1,* at 10G-10H; *see also Doc. 18* at 12; *Doc. 19* at 3.

he has a liberty interest in the distinction and calculation method, and because neither his habitual offender conviction nor the prior convictions that justified it were "violent" crimes, the State cannot treat the habitual portion of his sentence the same as the basic sentence for second degree murder. To do so he maintains will violate due process, equal protection and the prohibition of cruel and unusual punishment. *See Exhibit I* at 2J-2N.

Whether the claim is pursued under § 2254 or § 2241,[7] habeas relief is not available absent a constitutional violation. *See* 28 U.S.C. § 2254(a); *id.,* § 2241(c)(3). Petitioner's complaint that he is not being given the information required by the good time statute and applicable regulation at best asserts a violation of state law and is not actionable.[8]

Furthermore, the new statute's failure to distinguish between the basic sentence and the habitual offender enhancement cannot support LaVoy's claim to entitlement. Neither the federal constitution, nor the New Mexico good time statutes, creates any right to good time credits. Because the pre-1999 statute had been repealed, Petitioner had no "vested right" or "preexisting entitlement" to its section that specifically applied good time credits to both the basic and enhanced portions of a sentence. Indeed, both the pre-1999 and new statute only provide that a prisoner "may" earn good time credits. Without that right or entitlement, he has no basis for a due process claim. Also, LaVoy was not sentenced under the prior statute, and the new statute

---

[7]   Because this sort of challenge goes to the execution of his sentence rather than to the underlying state conviction, § 2241 is the appropriate federal statute for relief, and I will construe the claim as being brought under it. *E.g., Montez,* 208 F.3d 862, 865 (10th Cir. 2000); *United States v. Furman,* 112 F.3d 435, 438 (10th Cir. 1997); *Escandon v. State of New Mexico et. al.,* CIV 02-1561 BB/KBM (*Docs. 19, 21*), *certificate of appealability denied and appeal dismissed* (10th Cir. 12/29/03).

[8]   *See Exhibit O* (regulation); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."); *Montez,* 208 F.3d at 865 ("claims of state law violations are not cognizable in a federal habeas action.").

applied purely prospectively.  Because the good time statute does not effect the penalty for second degree murder in place at time of sentencing, Petitioner has no basis whatsoever to raise an *ex post facto* claim.[9]

In my view, Petitioner's claim that the prior statute's reference to an "enhanced" sentence established a distinction for good time credits purposes is specious.  The New Mexico Supreme Court recently discussed the effect of deleting the references to "basic" and "enhanced" in the new statute.  The terms were included in the prior version to distinguish between noncapital offences and capital offenses, so that capital offenders would be ineligible for good time credits.  *See Compton v. Lytle,* ___ N.M. ___, 81 P.3d 39, 45 (N.M. 2003).  Deleting the references in the new statute does not appear to change how good time credits are applied.  On their face, now, as then, good time credits are applied to the entire sentence.  The sole difference is that having committed a serious offense, Petitioner can only earn four credits per month served.[10]

While some state statutes and prison regulations can create liberty interests subject to due process, nowhere have the statutes or regulation here provided for the 85% / 50% formula

---

[9]  *E.g., California Dep't of Corrections v. Morales,* 514 U.S. 499, 506-07 & n.3 (1995); *Weaver v. Graham,* 450 U.S. 24, 29-30 (1981); *Wolff,* 418 U.S. at 557; *see also Johnson v. Ward,* 76 Fed. Appx. 858, 860 (2003) (no liberty interest in "opportunity to earn good-time credits. . . .  Denying a prisoner such opportunity does not present 'the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.'"); *McDaniel-Ortega v. Williams,* 1999 WL 71715 at *4 (10th Cir.) ("The possibility of good time credits under New Mexico law does not create a liberty interest that implicates due process."), *cert. denied,* 528 U.S. 836 (1999).

[10]  *C.f., State v. Mondragon,* 107 N.M.421, 423, 759 P.2d 1003, 1005 (N.M. Ct. App.) ("[a] sentence enhancement, though imposed on the basis of a defendant's status as an habitual offender, is nonetheless punishment for the commission of the crime to which the enhanced sentence attaches. . . . Thus, the power to pardon an individual from punishment for commission of a crime includes the power to preclude any punishment that might be imposed, upon conviction of that crime, as a result of an individual's status as an habitual offender."), *cert. denied,* 107 N.M. 267, 755 P.2d 605 (N.M. 1988).

Petitioner mentions. Therefore, the statutes do not create a liberty interest in any such formula.[11]

Nor will an attorney's advice that such a formula would be applied create such a liberty interest.

By its decision in *Sandin,* the Supreme Court plainly has disavowed any suggestion that liberty

interests in the prison setting can arise simply by an oral representation, much less by a prisoner's

attorney.[12]  In any event, even assuming for the purposes of argument that the 85% / 50%

representation was accurate, any challenge to its application is premature since Petitioner is years

away from beginning to serve the enhancement portion of his sentence.

    For all of the above reasons, I find that Petitioner has not raised a cognizable claim in

habeas relating to good time credits.

### (3)  Lack Of Evidentiary Hearing In State Habeas Proceedings

    Under New Mexico procedures governing post-conviction matters, judges "shall dispose

of the petition without a hearing" if it "does not appear that an evidentiary hearing is required."

N.M. CRIM. RULE 5-802(E)(3).  Having denied all of the claims, the state district court

specifically found that "[n]o evidentiary hearing is necessary."  *Exhibit J,* at ¶ 8.  As presented in

---

[11]  *C.f., Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989); *Sandin v. Conner,* 515 U.S. 472, 477-78, 483-84 (1995); *Wolf,* 418 U.S. at 557; *McDaniel-Ortega,* 1999 WL at *4 ("The possibility of good time credits under New Mexico law does not create a liberty interest that implicates due process. Petitioner cannot prove that he would have qualified for and received credits or that the state's action 'inevitably affect[ed] the duration of his sentence.' *Sandin,* 515 U.S. at 487.  Like *Sandin,* this case presents a scenario that is 'simply too attenuated' for constitutional protection.").

[12]  *See* 515 U.S. at 478 n.4, 484 (discussing *Vitek v. Jones,* 455 U.S. 480, 489-90 (1980); *Vitek* found liberty interest in prisoner not being transferred to mental institution arose from "objective expectation firmly fixed in state law and official penal Complex practice" that prisoners were not transferred unless found mentally ill and prison could not adequately care for them; Court held *Vitek* presented a situation that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"); *see also Klos v. Haskell,* 48 F.3d 81, 87, 89 (2nd Cir. 1995) (suggesting that under *Vitek* and dictum in *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458 (1981), promise by prison official could create liberty interest if language of statute is mandatory; concurring decision disagrees with dictum in majority opinion that suggests a promise can establish a liberty interest).

his federal petition, LaVoy's "ineffective assistance of counsel" claim focuses on the fact the that the judge did not afford him an evidentiary hearing.  *See Doc. 1* at 10F-10G.  However, the state court's decision not to hold an evidentiary hearing is not cognizable as a federal habeas claim because, at most, could be an error of state law.  *E.g,. Ellis v. Hargett,* 302 F.3d 1182, 1189 (10th Cir. 2002), *cert. denied,* 537 U.S. 1236 (2003); *see also Ellis v. Mullin,* 56 Fed. Appx. 858, 865, n.6 (10th Cir. 2003).

## III.  AEDPA Standard Of Review

Reviewing a petition through the "lens" of AEDPA, a federal court cannot grant a writ of habeas corpus unless:  (1) the state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" Supreme Court precedent; or (2) is "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. §§ 2254(d)(1)-(2).  The Supreme Court has construed and reiterated the proper application of these statutory provisions over the course of several recent opinions.  *See Mitchell v. Esparza,* ___ U.S. ___, 124 S. Ct. 7 (2003) (*per curiam*); *Wiggins v. Smith*, ___ U.S. ___, 123 S. Ct. 2527 (2003); *Price v. Vincent,* 538 U.S. 634, 123 S. Ct. 1848 (2003); *Lockyer v. Andrade,* 538 U.S. 63 (2003); *Woodford v. Visciotti,* 537 U.S. 19 (2002) (*per curiam*); *Early v. Packer,* 537 U.S. 3 (2002) (*per curiam*), *rehearing denied,* 537 U.S. 1148 (2003); *Bell v. Cone,* 535 U.S. 685 (2002); *Williams v. Taylor,* 529 U.S. 362 (2000); *see also Miller,* ___ F.3d ___, 2004 WL 96739 (10th Cir. 2004).

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" in § 2254(d)(1) "'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"  *Lockyer,* 538 U.S. at 71

(quoting *Williams,* 529 U.S. at 412).  Thus, "whatever would qualify as an old rule under . . . *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1) . . . [except that,] as the statutory language makes clear, . . . § 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams,* 529 U.S. at 412.

A state decision is "contrary to" Supreme Court precedent if it "'applies a rule that contradicts the governing law set forth in [those] cases.'" *Price,* 538 U.S. 634, ___, 123 S. Ct. at 1853 (quoting *Williams,* 529 U.S. at 405); *see also Mitchell,* ___ U.S. ___, 124 S. Ct. at 10 (same); *Williams,* 529 U.S. at 406 (citing as an example that changing burden of proof for prejudice under *Strickland* standard would be "'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' . . . to our clearly established precedent"); *id.* at 413 ("a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law").

A state decision is also "contrary to" Supreme Court precedent if it "'confronts a set of facts that are materially indistinguishable from a decision . . . and nevertheless arrives at a result different [from the decision].'" *Price,* 538 U.S. 634, ___, 123 S. Ct. at 1853 (quoting *Williams,* 529 U.S. at 406); *see also Mitchell,* ___ U.S. ___, 124 S. Ct. at 10 (same); *Williams,* 529 U.S. a 413 (decision is "contrary to" if the "state court decides a case differently than [the Court] has on a set of materially indistinguishable facts.").

However, a decision is not "contrary to" "simply because the [state] court did not cite [Supreme Court] opinions. . . . [A] state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts

them.'" *Mitchell,* ___ U.S. ___, 124 S. Ct. at 10 (quoting *Early,* 532 U.S. at 8); *Woodford,* 537

U.S. at 24 (noting "the presumption that state courts know and follow the law"); *see also Miller,*

___ F.3d. ___, ___, 2004 WL 96739 at *3-4 (federal court applies AEDPA standard

"notwithstanding the [state courts'] failure to cite or discuss federal case law.").  Indeed, a state

court need not even discuss a claim for the AEDPA standards to apply.  So long as the state court

does not dismiss a claim on procedural grounds, this Court applies the AEDPA standards

regardless of whether there is any reasoning supporting the "decision."[13]  Thus, if a state court's

reasoning and/or its result do not contradict established Supreme Court precedent, a decision is

not "contrary to" simply because the federal court holds a different view where the Supreme

Court precedent "is, at best, ambiguous."  *See Mitchell,* ___ U.S. ___, 124 S. Ct. at 11.

     A state decision is an "unreasonable application" of Supreme Court precedent if it

"identifies the correct governing legal principle from [the Court's] decisions but unreasonably

applies that principle to the facts of the prisoner's case."  *Williams,* 529 U.S. at 413; s*ee also e.g.,*

*Lockyer,* 538 U.S. at 75.  However, "it is not enough that a federal habeas court, in its

independent review of the legal question, is left with a firm conviction that the state court" applied

"clearly established federal law erroneously or incorrectly."  *Lockyer,* 538 U.S. at 75-76 (internal

quotations and citations omitted).  "Rather, that application must be objectively unreasonable."

---

[13]  *See Cook v. McKune,* 323 F.3d 825, 831 (10th Cir. 2003); *see also in Chadwick v. Janecka,* 312 F.3d 597, 606 (3rd Cir. 2002) (discussing that in *Weeks v. Angelone,* 528 U.S. 225 (2000), Supreme Court applied AEDPA standards of review to claim state court dismissed summarily; Fourth Circuit had specifically held that AEDPA applies to summary dispositions), *cert. denied,* 123 S. Ct. 1914 (2003); *compare Morris v. Burnett,* 319 F.3d 1254, 1267 (10th Cir.) (if the "state court addresses the great bulk of the issues raised by the petitioner's brief in that court but omits to address a particular claim, we have inferred that the claim was not decided 'on the merits' in the state court" and therefore do not apply the AEDPA standards of review), *cert. denied,* 124 S. Ct. 284 (2003).

*Id.*

Finally, a state decision rests on an "unreasonable determination of the facts" where it is

shown by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), that the factual finding is

erroneous. *Wiggins* ___ U.S. ___, 123 S. Ct. at 2539; *see also e.g., Toles v. Gibson,* 269 F.3d

1167, 1182 (10th Cir. 2001) (findings of historical fact entitled to presumption of correctness

unless overcome by clear and convincing evidence), *cert. denied,* 538 U.S. 948 (2003).

# IV.  Investigation & Evidence

This section highlights the factual background of the main controversies that formed the

basis of several defense motions at trial and of the claims in subsequent state court proceedings

and here.  Additional facts are set forth separately, in the relevant analysis sections.

## A.  Jealousy As Possible Motive

The fight between Petitioner and Stoney occurred in late afternoon on Saturday, February

19, 2000.  *Trial Transcript* at 175.  Another homeless man, Bradley Dehringer,[14] found the body

the next day, Sunday, February 20, 2000, around 11:00 a.m., and called the police.  *Id.* at 247.

Dehringer spoke to the police twice that day, shortly after he called them and again around 5:00

p.m.  *Id.* at 265.  He is a veteran who suffers from post-traumatic stress syndrome, and was upset

during his conversations with the police.  *See id.* at 249-50, 255-56.

The testimony is not entirely clear what Dehringer told the officers during which

conversation.  At one point he told them that he did not know Stoney and did not know anyone

who would want to hurt him.  *See id.* at 248, 253.  At another point, when an officer asked

---

[14]  In some portions of the record he is referred to as "Bradley Dillinger," *e.g., Record Proper* at 35, but I will use the spelling that appears in the trial transcript, *e.g., Trial Transcript* at 3.

Dehringer if Petitioner and Stoney had "words" or became aggressive with each other, Dehringer responded "not in my presence." *Id.* at 254, 258. Apparently during the 5:00 p.m. interview, this exchange took place:

| | |
|---|---|
| Officer: | Who hooked this guy Stoney, who killed him? |
| Dehringer: | I believe Todd LaVoy did, but you already checked him out. |
| Officer: | Why do you think Todd LaVoy did it?" |
| Dehringer: | Jealousy over Ruthie. . . . [Stoney was] being rude to her. |

*Id.* at 256-57.

## B. *Petitioner's & Ruthie's Inconsistent Stories*

### (1)  Initial Statements Of Ruthie & Petitioner

When Petitioner and Ruthie spoke to the police the first time around 3:30 p.m. on February 20th, they did not know Stoney had died from his injuries. They both denied having any knowledge of what had happened and further denied having had any problems with Stoney. The following day, they told the officers a different story. *See, e.g., Exhibit B* at 3 (if document were numbered sequentially from cover page); *Exhibit G* at 2; *Trial Transcript* at 111-118, 177-78, 186-87.

### (2)  Ruthie's Subsequent Statements

Ruthie died before trial. Only three places in the record contain discussions of the substance of what she said to the police on that second occasion on Monday, February 21, 2000. Those statements are discussed in officer testimony during a suppression hearing, in Petitioner's docketing statement, and in the petition for certiorari on direct appeal. The three sources contain different versions of what Ruthie said. Evidently, Ruthie's statement to the police was neither taped nor written, since neither the officer nor counsel refer or quote from any such document.

14

During the suppression hearing, the officer testified that Ruthie told him "that [Petitioner] had admitted to her that he had hit [Stoney]." *Tape Log/Tape* (3/6/01). The docketing statement asserts that Ruthie said much more.

> [Ruthie] was taken to a room where she was told that [Stoney] had been killed. She then told the police that she had known [Stoney] since they were kids. She told them that she had been assaulted on several occasions by [Stoney]. That he had tried to rape her on at least two occasions and that he had thrown a bolder at her in Colorado Springs. She told the police that he had been looking for her in Las Cruces for about three weeks and that he stalked her for years. She told police that Stoney had grabbed her arm and tried to drag her down and that she and [Petitioner] had to get away from Stoney. She further told the police that [Petitioner] knew about the incidents where Stoney attempted to harm her. She told the police that [Petitioner] had told her he hit Stoney. She said no one said "killed."

*Exhibit B* at 5 (if numbered sequentially from cover page). It is not clear from this version when and where Stoney allegedly grabbed Ruthie.

The version in the petition for certiorari is essentially the same, but unsuccessfully attempts to clarify where the grab occurred by stating that "[w]hen [Stoney] found Ruthie in Las Cruces, he had grabbed her by the arm and tried to drag her down. She and [Petitioner] had to get away from [Stoney]. Ruthie said she had told [Petitioner] about the incidents where [Stoney] had tried to hurt her." *Exhibit G* at 3. These renditions do not state whether Stoney grabbed Ruthie on the date of the incident or sometime earlier in Las Cruces.

### (3)  Petitioner's Subsequent Statement To Police

When LaVoy spoke with the police on the 21st and "came clean," he also related to the officers that he acted to protect Ruthie. His statement was taped and transcribed, but is not a part of the record. However, relevant portions of that statement were read verbatim during trial.

Officer:        Go ahead and start from the very beginning of the day in the morning and
                explain to us what happened that day.

Petitioner:     That morning Art and, as I know him, Stoney showed up with a
                can.  When it was approximately, I'd say, eight, not even then, it
                was actually somewhere around eight, 8:30 in the morning, me and
                Ruthie were still in bed.  We got up, we went over to the other side
                of the hill from the restaurant there where our tent was at because it
                was in the sun, so we sat over there.  Me and Stoney went to
                Albertson's, got a beer and whiskey.  We commenced to drinking.
                There was other people that showed up, apparently got intoxicated.
                Stoney becoming mean and crude and Ruthie went back over to
                camp.  And Stoney started saying what he was going to do to
                Ruthie, and how he was going to take her, was his exact words.
                "I'm taking her," and we got in an argument over that and he said,
                "I'll kick your ass," and he got up and that's when I shoved him
                down and picked up a rock and I hit him in the head.  I asked him,
                have you had enough, and he – "Fuck you," and I picked it up and
                hit him again, and I picked up the rock a third time and put it over
                by the wooden fence.  I went over and got Ruthie.  Told her come
                on, let's go, and we packed our stuff and left.

*Trial Transcript* at 132-33.

When the officer asked whether it was difficult to shove Stoney down, Petitioner replied

that "it didn't take much" because Stoney "been drinking and it didn't take much to shove him

down."  *Id.* at 133.  When the officer asked what he thought Stoney was going to do, Petitioner

replied:

                I didn't know.  All I knew was that the conversation – the tone of
                the conversation wasn't pleasant, you know what I mean.  It was an
                aggressive tone, when he threatened that he was going to kick my
                ass and went to get up.  That's when I shoved him down, and like I
                said, we were all intoxicated, so that we were all pretty well drunk
                anyway and it didn't take much to shove him down, but then I
                grabbed that rock and hit him.

*Id.* at 136-37.  When the officer asked what Petitioner was attempting to do when Stoney tried to

get up, he replied:  "Just hurt [Stoney], let him know not to fuck with me and Ruthie, you know, I

16

didn't mean to hurt him like that I didn't mean to kill nobody." *Id.* at 137.

In these excerpts and other responses to officer questions, by way of this second statement Petitioner thus contended that:

(1)     Ruthie was not present at the altercation; only Stoney and Petitioner knew exactly what happened that day;

(2)     Stoney was already on the ground when Petitioner hit him for the first time and remained on the ground when he hit him the second time;

(3)     the rock Petitioner used was the size of a "football or basketball," and in any event, heavy enough that it took two hands for him to pick it up;

(4)     as of the date of the incident, Petitioner ***did not*** know about any prior physical contact between Ruthie and Stoney; and

(5)     later that day after the incident or maybe the next day, Petitioner informed Ruthie that he had hit Stoney, but did not provide her any of the details, *id.* at 136

*See id.* at 134-36 (emphasis added).

Several things Petitioner omitted from this statement became relevant in light of his trial testimony.  That is, he did not mention that Stoney was the first physical aggressor.  Rather, in this statement LaVoy maintained that a verbal argument provoked him to assault Stoney.  Also, Petitioner made no mention that he had seen Stoney physically assault anyone else, or that Stoney had a reputation for violence.  *See id.* at 140.  Petitioner would change his story in several significant respects when he took the stand at trial.

### (4)  Petitioner's Testimony At Trial

At trial, Petitioner testified that he first met and began camping with Ruthie in Colorado during the Spring of 1999.  One day Stoney showed up at their campsite uninvited and told Petitioner that Ruthie was his (Stoney's) girlfriend.  When Stoney left to fetch alcohol, Ruthie

told Petitioner that Stoney previously beat her and attempted to rape her and that she was afraid

of him.  Petitioner asked her if she wanted to move camp and she said "yes" because of her fear.

*See id.* at 149, 151-52.  They encountered Stoney one more time in Colorado in October and on

that occasion he severely beat someone for not giving him cigarettes.  *See id.* at 153-54.  Later

that same day, Stoney tried to start a fight with Petitioner, but others broke it up.  Petitioner and

Ruthie then left Colorado and headed southeast.  *See id.* at 155-57.  Petitioner testified that when

they were staying in Amarillo, Texas, they learned Stoney had arrived there looking for Ruthie, so

she and Petitioner left, heading for Florida.  *See id.* at 158.  In Florida, Petitioner was arrested and

jailed for shoplifting and during his incarceration Ruthie left, headed for Las Cruces.  LaVoy

claimed that she later told him she left Florida because she had heard Stoney was there and she

was afraid.  *See id.* at 159-60.

When Ruthie arrived in Las Cruces, she stayed at a friend's house, but when Petitioner

joined her in Las Cruces, they began camping again.  *See id.* at 163.  Ruthie told Petitioner that

Stoney was in Las Cruces and she was fearful of him, but they did not actually encounter Stoney

before the date of the incident.  *See id.* at 166-68.  They did, however, "put out word to everyone

that we didn't want him around."  *Id.* at 67.

As for the fight, after drinking all day with Stoney and others in the vicinity of their

campsite, Stoney began "acting up" by threatening violence, trying to pick fights, and  making

derogatory statements about Ruthie.  According to Petitioner, Stoney said:  "That bitch is going

with me and she's going to do what I tell her to do."  *Id.* at 182.  Ruthie became afraid and

therefore went back to the tent.  *See id.* at 174-76.  At this point Petitioner and Stoney were the

only ones left with Stoney "continuously talking" about Ruthie and asking Petitioner if he was

18

"tough" and could "beat" Stoney's "ass."  According to Petitioner, Stoney initiated the fight by getting up, hitting Petitioner in the mouth, knocking Petitioner down, and punching and kicking Petitioner while he was on the ground.  *Id.* at 177.  In other words, Stoney was the sole and initial verbal ***and*** physical aggressor.

In response to Stoney's aggression, Petitioner claimed that he defended himself by shoving Stoney down, picking up a basketball-sized piece of mortar used to hold a fence post in the ground, and hitting him with it.  The first blow did not incapacitate Stoney and, because he was trying to get up, Petitioner hit him again.  *See id.* at 178-80.

Petitioner delivered the second blow as a "reaction" to the "fear" he was feeling  – "The man had already hurt me.  He'd already spoke of what he was going to do to Ruthie.  He'd already , to my knowledge, he'd already previously hurt Ruthie, and I just wanted to stop him from hurting me anymore or get to Ruthie." *Id.* at 181.  He did not know what Stoney would have done if Petitioner had let him go after the first blow, *id.,* but based on what he understood to be Stoney's past treatment of Ruthie, what he believed to be Stoney's obsession with Ruthie, and Stoney's earlier comment that day about "taking" her, Petitioner thought that perhaps Stoney literally meant to physically take Ruthie.  *See id.* at 181-83.

Petitioner explained to the jury that he did not tell the officers about Stoney being the first aggressor or any of the other new details he now related in his testimony because the officers did not directly ask him for those details and because he did not think of mentioning them at the time. *See id.* at 177-78, 186-87.  Rather, the officers had interrogated and "badgered" him for a long time without giving him the attorney he had asked for, and had threatened to also "arrest" Ruthie. In light of this treatment, Petitioner neglected to mention certain details, focusing instead on

ensuring that Ruthie, the girlfriend that he loved, would not be arrested.  *See id.* at 186-88.

## C.  *Ruthie's Proffered Testimony, Limitations On Introducing The Substance Of Her Testimony, And Alternative Substitutes*

From the beginning, Ruthie appeared on prosecution's witness list as someone it "intend[ed] to call . . . at trial."  *Record Proper* at 35 (prosecution witness list dated 4/6/00).  She appeared on the initial defense witness list as someone the defense "may call" at trial.  *Id.* at 45 (defense witness list dated 12/4/00).  The defense would have called her to testify that, in the past, Stoney attempted to rape her and beat her, that he stalked her around the country and in Las Cruces, and that when Stoney threatened what he would do to her and started a fight with Petitioner, she ran off and Petitioner fought back.  Ruthie's death was thus problematic because her testimony directly related to theories of self-defense and defense of others.  *Tape Log/Tape (03/6/01); see also* Exhibit B at 5 (if numbered sequentially from cover page) ("During the investigation by the defense, it was learned from [Ruthie] that [Stoney] had stalked her through several states.  She also would have testified that [Stoney] had threatened her in front of [Todd] and had said he would take her physically any time he wanted.").

Although Petitioner could testify to the same things Ruthie would have, if he did so defense counsel wanted other witnesses to corroborate his testimony:

> [Petitioner] could testify to those things, and more than likely will, but it will be [Petitioner's] word out of a vacuum, as a defendant, and we need people to be able to substantiate that [Petitioner] isn't making this up.  That they knew of these things and [Petitioner] knew of these things previously, and at the time of the physical altercation that this wasn't something that came up after the altercation but something that came up prior to the altercation.

*Tape Log/Tape (03/6/01).*

20

Dehringer, who found Stoney's body, and Jay Olmstead, with whom Ruthie lived in Las Cruces before Petitioner's arrival, appeared on witness lists for both the prosecution and defense from the beginning of the case. *See Record Proper* at 35, 45. In December, the defense had also discussed bringing an out-of-state witness, Stoney's brother, to testify about Stoney's reputation for violence when drunk. On March 2, 2001, the defense further identified five new witnesses it intended to call. Three of the new witnesses – Aaron Beavins, Joann Brown and Marie Estepp – were located in Las Cruces. The two remaining witnesses – Holly Warren (her sister) and Patrick Dudley (her incarcerated brother) – were located in Colorado. *See Record Proper* at 79; s*ee also Tape Log/Tape (3/6/01)*.

Defense counsel told the trial judge that, in light of Ruthie's death, he wanted the Colorado relatives to testify, to "substantiate the fact that Ruthie was afraid of [Stoney] and had been injured by [Stoney] in the past and therefore needed help from [Petitioner]." *Tape Log/Tape (3/6/01)*. Specifically, Dudley would have testified that he was presently incarcerated apparently as a result of beating Stoney to defend Ruthie on an occasion in Colorado when Stoney was physically threatening her. *See id.* Warren would have testified that Ruthie told her that Stoney had been violent toward her. *See id.* Neither counsel nor the state pleadings specifically indicate what the Las Cruces witnesses would have said, but when the trial judge asked counsel if he had witnesses who would testify that Stoney was looking for Ruthie in the weeks just prior to the fight, he replied "yes." *See id.*

Among the motions filed by the parties just prior to trial, the defense moved to allow the Colorado witnesses to testify by telephone and the State moved to exclude any evidence of Stoney's "bad character" or "bad acts." *See Record Proper* at 81, 93. The trial judge held a

motions hearing the week prior to trial.  *See Tape Log/Tape (3/6/01).*  She recognized that

Ruthie's death presented " unusual circumstances here.  We have a key witness to the defense that

has died.  Her involvement with the victim seems to be a material fact to the defense of who was

the first aggressor."  *Id.*  She granted the State's motion in part, limiting the "time frame" and

"scope" of the sort of evidence the defense could introduce.  She characterized any statements by

Ruthie to others about Stoney's prior attempted rape and beatings as hearsay not subject to the

catch-all exception for "trustworthy" statements, or as nonhearsay cumulative of other testimony.

She also limited evidence of Stoney's alleged rape and beatings of Ruthie to three years prior to

his fight with Petitioner.  *See id.; see also Record Proper* at 110-13.

     However, she did not foreclose the defense's ability to present its case solely through

LaVoy's testimony.  As a result of her rulings, the defense could:

    (1)  through LaVoy, present any evidence of Stoney's prior conduct known to him;

    (2)  through LaVoy, present any evidence of what Stoney said to him on the day of the
        altercation;

    (3)  through Ruthie's brother, Dudley, present evidence of Stoney's prior conduct toward
        Ruthie within the three-year time frame of which he had personal knowledge;

    (4)  through any witness, present evidence that Stoney was looking for Ruthie in Las
        Cruces; and

    (5)  through any witness, present evidence of Stoney's reputation in Las Cruces for
        violence.

*See id.; see also Record Proper* at 110-13.

     At the hearing, the defense informed the trial judge that it had decided to forego calling

Stoney's brother as a witness not only because the brother was blind but also because he had

asked the defense "not to bring him down and do a character assassination on his brother."  *See*

*Tape Log/Tape (3/6/01).*  In light of those circumstances, the defense was concerned that if they

called the brother as a witness, he "wouldn't be of any value to the jury."  *Id.*

　　　As it stood at the end of the pretrial hearing then, the defense's potential witnesses were:

Petitioner, Las Cruces witnesses Dehringer, Olmstead, Beavins, Brown, and Estepp, and possibly

Colorado relative Dudley.  At the beginning of trial, in response to the prosecutor's inquiry asking

for a list of defense trial witnesses, defense counsel informed the court that he would be calling

Petitioner, Dehringer, Olmstead, Beavins, and perhaps a police officer.  *Trial Transcript* at 29-31.

Dudley, therefore, must have indicated that the alteration he witnessed between Ruthie and

Stoney was outside the three-year limit.  Just after the State rested, the prosecutor again asked

who the defense would be calling, and defense counsel informed the court that Petitioner,

"Dehringer for sure and probably Olmstead."  *Id.* at 143.  As it turned out, however, only the two

defense witnesses who were in police custody, Petitioner and Dehringer, testified at trial.

### D.  At Trial, State Could Not Provide Eyewitness Identification Of Petitioner

　　　The State too had a problem with a key witness.  On the day the fight occurred, two

employees working at Albertson's supermarket saw part of the altercation.  Because a fence

obstructed part of their view of the scene, all they were able to see was the person with the rock

from the waist up.  Both of these two neutral eyewitnesses were able to describe the clothing the

assailant wore, and their descriptions matched the clothes Petitioner was wearing that day.  They

were also able to describe that the assailant struck twice with a large rock, and their description

was consistent not only with the opinion of the medical examiner regarding the manner and cause

of Stoney's death, but consistent with Petitioner's description of what he did with the rock while

Stoney was on the ground.  One of the witnesses also heard a female voice off in the distance, and

stated that the assailant walked toward the voice after the last time he slammed down the rock, again consistent with Petitioner's account. *See e.g., Trial Transcript* 41-89. *Id.* at 86-87.

According to the police, they showed both witnesses an array of six photographs that contained a photo of Petitioner taken on February 21st. The witness who, at the time of the crime, remarked, "'I wonder what that guy is trying to kill,'" *id.* at 44, did not have a clear view of the assailant's face, *id.,* and was not able to identify Petitioner for the police, *id.* at 110. According to the police, the other eyewitness did pick Petitioner's photo out of the six she was shown. *See id.* at 110-11.

The witness who positively identified Petitioner, however, suffered a head injury several weeks after the incident and, at the time of trial, still continued to have some memory loss. *Id.* at 73. Although she had no independent recollection of the events and reading her statement to the police did not refresh her memory, she remembered being in the police office and "vaguely" recalled giving a statement to the police. She testified that she believed it to be her statement because her name was on it, and believed that she gave them a true statement at the time. *See id.* at 73-75, 80-82. The trial judge allowed her statement to be read to the jury, and so one of the prosecutors read the officer's questions and the other read the witness' responses. *See id.* at 83-84.

This statement to the police did not include her subsequent identification of Petitioner from the array of six photographs. Instead, it is evident that, at the time of the statement, she was shown a copy of Petitioner's driver's license. Albertson's had photocopied LaVoy's driver's license early in the day before the fight occurred, when he had been stopped by store employees for suspected shoplifting. The witness told the officer she could not tell whether the person in the

24

driver's license picture was the same person she had seen, and that she would "have to see the photo they took of him. . . . Because he had his hair longer now." *Id.* at 88.

# V.  Analysis

As evidenced by the motions filed prior to trial, part of the defense strategy was to have the charges dismissed based in a violation of the right to a speedy trial.  Absent that relief, the defense would seek to have Petitioner's confession suppressed, which possibly left the State without a statement from Ruthie that he had struck Stoney and without an eyewitness who could positively identify him in court.  If Petitioner's statement was not suppressed, the defense could pursue a self-defense/defense of others theory, using other witnesses to corroborate the contention that Ruthie was being stalked and feared Stoney.  If these defenses were successful, then Petitioner could either make a case for voluntary manslaughter, *see Record Proper* at 151-56 (defendant's requested jury instructions) which exposed him to six years imprisonment rather than the fifteen-year imprisonment sentence required for the charge of second degree murder,[15] or, better, for acquittal of any crime.  *See id.* at 151-56 (defendant's requested jury instructions); *id.* at 130-49 (court's instruction to jury that if it found sufficient provocation, Petitioner could not be found guilty of second degree murder and if it found self-defense or defense of Ruthie it must acquit).

---

[15]     *Compare* N.M. STAT. ANN. § 30-2-1 (Michie 1994) (second degree murder, a second degree felony, occurs where person does not act upon sufficient provocation or with lawful justification or excuse and performs an act that causes death knowing that the act creates strong probability of death or great bodily harm); *and* N.M. STAT. ANN. § 31-18-15(A)(2) (Michie Cumulative Supp. 2003) (second degree felony resulting in death of human being requires sentence of fifteen years imprisonment), *with*  N.M. STAT. ANN. § 30-2-3(A) (Michie 1994) (voluntary manslaughter, a third degree felony, occurs when a killing committed in sudden quarrel or heat of passion), *and* N.M. STAT. ANN. § 31-18-15(A)(4) (Cumulative Supp. 2003) (third degree felony resulting in death of human being requires sentence of six years imprisonment).

Petitioner's ineffective assistance of counsel claim as related in his federal petition only contains his argument that the trial court failed to provide an evidentiary hearing. However, other pleadings filed with this court make it plain that he intended to assert the same arguments he raised in state court pleadings. A number of these specific ineffectiveness claims relate to other separately-numbered claims. As such, in some instances I review the ineffectiveness claims at the same time I review the related claim, applying the two-prong test announced in *Strickland v. Washington,* 466 U.S. 668 (1984), which governs and is "clearly established" federal law for AEDPA purposes. *See, e.g., Wiggins,* ___ U.S. ___, ___, 123 S. Ct. at 2535-36.[16]

## A. Speedy Trial

### (1) Speedy Trial Factual Background

LaVoy was arrested on February 21, 2000, charged by information on March 14, 2000, and arraigned on April 3, 2000. *See Record Proper* at 15, 25, 71; *Tape Log/Tape (4/3/00).*[17]

---

[16]    An ineffective assistance of counsel claim fails if either of the *Strickland* prongs are not met. It is entirely appropriate for a habeas court to analyze the prejudice prong first and exclusively, if that is the easier course. *E.g., Scoggin v. Kaiser,* 186 F.3d 1203, 1207 (10th Cir.), *cert. denied,* 528 U.S. 953 (1999); *Cooks v. Ward,* 165 F.3d 1283, 1292-93 (10th Cir. 1998), *cert. denied,* 528 U.S. 834 (1999).
    LaVoy must first show that counsel's representation was "objectively unreasonable." *E.g., Wiggins,* 123 S. Ct. at 2535. In doing so, LaVoy must overcome the "strong presumption" that counsel's conduct falls within the "wide range" of conduct that is considered to be trial strategy and is deemed "reasonable professional assistance." To be constitutionally ineffective, counsel's conduct "must have been completely unreasonable, not merely wrong." *Bullock v. Carver,* 297 F.3d 1036, 1046-50 (10th Cir.) (and recent decisions cited therein), *cert. denied,* 123 S. Ct. 703 (2002); *see also Bell,* 122 S. Ct. at 1863.
    LaVoy must also establish "prejudice" – that is, absent counsel's errors, there is a "reasonable probability" that the outcome of the proceeding would have been different. *E.g., Wiggins,* 123 S. Ct. at 2542; *Moore,* 195 F.3d at 1178. "Reasonable probability" means that confidence in the outcome is undermined. *E.g., Wiggins,* 123 S. Ct. at 2542; *Foster v. Ward,* 182 F.3d 1177, 1185 (10th Cir. 1999), *cert. denied,* 529 U.S. 1027 (2000).

[17]    The Public Defender entered an appearance for LaVoy soon thereafter and the parties began plea negotiations. *See Record Proper* at 21; *Tape Log/Tape* (3/20/00). Those negotiations fell through and LaVoy "passed" on arraignment on March 20, 2000 because the State intended to take the charges to the grand jury. *Tape Log/Tape* (3/20/00). Apparently it did not because on April 3, 2000, LaVoy again

State law requires that criminal cases be tried within six months.  "[T]rial of a criminal case . . .
shall be commenced six (6) months after whichever of the following events occurs latest . . . date
of arraignment, or waiver of arraignment, in the district court."  N.M. CRIM RULE 5-604(B)(1).  In
late August 2000 trial was set for September 26, 2000.  *Record Proper* at 39.  Based on the later
April 3rd arraignment date, the trial setting thus fell within the State's "six-month" rule for trial,
because that period would have expired on October 3, 2000.

Part of the tape in which counsel discussed his efforts to interview witnesses before the
first scheduled trial is garbled, but other excerpts establish that counsel and his investigator
attempted to find and interview homeless people during the Summer 2000.  They were not
entirely successful.  They did, however, interview Ruthie prior to the first trial.  At that time
defense counsel and Petitioner knew she was ill and had been hospitalized – she was an alcoholic
and was being treated for cancer.  Yet no attempt was made to preserve her testimony because
she was feeling better and was in Las Cruces.  They had no idea she was ill enough to soon die.
*Tape Log/Tape* (3/6/01).

LaVoy did not go to trial in September because he was "bumped" by the first trial set that
day.  Neither the defense nor the State requested the court to give Petitioner's trial priority on the
ground that witnesses were homeless.  *See id.*  Indeed, neither party alerted the court that being
"bumped" would pose a problem for any reason.  On September 29, 2000, the State moved for an
extension of the "six month" rule, and reported that defense counsel "took no position" on the
matter.  As "good cause," the State indicated that the first trial had been "bumped" and that

_____

appeared for arraignment and pleaded not guilty, and there is no record of an indictment in the case.  *See
Record Proper* at 25; *Tape Log/Tape* (4/3/00).

counsel for all parties were continuing to interview witnesses and investigate in preparation for trial. *See Record Proper* at 40-41; *see also* N.M. CRIM. RULE 5-604(C) ("For good cause shown, the time for commencement of trial may be extended by the trial judge provided that the aggregate of all extensions granted . . . may not exceed three (3) months").

The trial judge granted a speedy trial extension to January 3, 2001 and rescheduled trial for December 19, 2000. Defense counsel did not indicate any opposition to the extension and new setting. *See Record Proper* at 43-44; *Tape Log/Tape* (3/6/01). By the time the order entered granting the extension, Ruthie had died on October 14, 2000. Evidently defense counsel learned of the death approximately ten days before the December trial, when he joined with the State in a trial court motion to again extend the trial date and in a New Mexico Supreme Court motion to permit the extension outside the previously-granted three month extension.[18] Neither motion, however, mentions Ruthie's death. *See Record Proper* at 49. Among other things, for good cause, they asserted that some witnesses for both sides were homeless and some were now out of the state. Counsel wanted more time to locate the witnesses and "agreed to conduct depositions" of the homeless witnesses. The New Mexico Supreme Court granted the motion and the trial was rescheduled for March 13, 2001. *See id.* at 50-52.

In early January 2001, defense counsel pursued a motion to submit a proposed questionnaire to the jury pool. *See Record Proper* at 54-65; *Tape Log/Tape* (1/10/01). On

---

[18] *Record Proper* at 46 (State 12/4/00 witness list includes Ruthie); *id.* at 48-49 (12/8/00 joint motion for extension); *Exhibit B* (docketing statement stating Ruthie's death was "devastating to the defense and on December 8, 2000 counsel for Mr. LaVoy agreed to a joint motion to continue. No one had been able to serve subpoenas on any of the 'homeless' witnesses, and without [Ruthie] their testimony became more necessary."); *see also* N.M. CRIM. RULE 5-604(D) ("For good cause shown, the time for commencement of trial may be extended by the Supreme Court or a justice thereof.").

February 27, 2001, defense counsel moved to dismiss the charges for failure to provide a speedy

trial as required by the United States and New Mexico constitutions.  He argued that Ruthie had

died and that he was unable to locate Dehringer or two other homeless witnesses who could

testify to: the relationship Ruthie had with Stoney, Stoney's  "hunting/stalking" and to Stoney's

violent nature when drinking.  *See id.* at 71-74.

### (2) Supreme Court Speedy Trial Jurisprudence

        Both in the state courts and here, Petitioner asserts that he was denied his constitutional

right to a speedy trial.  *See Doc. 1* at 10A-10B; *Exhibit D* at 4-10; *Exhibit I* at 2C-2D.  "[T]he

Sixth Amendment's speedy trial provision [is] 'an important safeguard to prevent undue and

oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public

accusation and to limit the possibilities that long delay will impair the ability of an accused to

defend himself.'"  *United States v. Marion,* 404 U.S. 307, 320 (1971) (quoting *United States v.

Ewell,* 383 U.S. 116, 120 (1966)).  While passage of time "may impair memories, cause evidence

to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend

himself," mere delay is not sufficient to establish a violation.  *Id.* at 321.  Even short delays

inherently contain the possibility of prejudice.  But the prejudice does not necessarily effect the

defense, or effect the defense negatively.  *Id.* at 322.  Indeed, delay can "work to the accused's

advantage," *Barker v. Wingo,* 407 U.S. 514, 521 (1972), as well as "weaken the Government's

case," *Marion,* 404 U.S. at 322.  Delay then is a "two-edged sword," *United States v. Loud

Hawk,* 747 U.S. 302, 315 (1986), and the "societal interest in providing a speedy trial [can] at

times" actually impair defense interests, *Barker,* 407 U.S. at 519.  As such, the Sixth Amendment

right to a speedy trial has a "generically different nature" than other constitutional rights that offer

"protection of the accused."  *Id.*

In applying AEDPA standards to a speedy trial claim, the most significant aspect of established Supreme Court precedent is that there is no bright-line rule for determining when a violation of constitutional magnitude has occurred.  Instead, the Supreme Court holds that

> [i]t is . . . impossible to determine with precision when the right has been denied.  We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate.  As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial.

*Id.* at 520.  Therefore, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."  *Id.*

The *Barker* decision thus adopted a "balancing test . . . in which the conduct of both the prosecution and the defendant are weighted," a test that "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis."  *Id.* at 530.  It also "identif[ied] some of the factors which courts should assess," specifically "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Id.*

### (3)  Decision To Apply *Barker* Factors Was Not "Contrary" Or "Unreasonable"

The length of the delay is a threshold "triggering" mechanism for speedy trial purposes.  Only if the length of delay can be characterized as "uncommonly long," in other words, "presumptively prejudicial," does the inquiry broaden into a balancing of other factors.  *E.g., Doggett v. United States,* 505 U.S. 647, 651-52 (1992).  In this case, LaVoy was arrested on February 21, 2000 and his trial commenced on March 13, 2001, in other words, one year and

twenty days after arrest.[19]  Both the trial judge and the appellate court proceeded to balance the

*Barker* factors in arriving at their conclusions that LaVoy's speedy trial rights were not violated.[20]

Indeed, when, as here, a trial date is beyond a year from arrest, the delay is "generally" considered

"presumptively prejudicial" thereby triggering the balancing inquiry.  *E.g., id.* at 652 (1992)

("Depending on the nature of the charges, the lower courts have generally found post-accusation

delay 'presumptively prejudicial' at least as it approaches one year.").  Therefore, although the

length of delay in LaVoy's case was not necessarily uncommonly long,[21] the state court's decision

to balance the factors[22] was neither contrary to nor an unreasonable application of Supreme Court

precedent.

---

[19]  State court proceedings refer to the delay as a one-year and thirteen-day period.  I am unsure how they arrived at this figure, but the discrepancy does not effect the analysis.  *See e.g., Tape/Log 3/6/01; Record Proper* at 105; *Exhibit C* at 5.

[20]  They reached the same result for slightly different reasons.  The trial judge's written order does not memorialize all of her reasons.  *See Record* at 105-07.  At the motion hearing, she weighed the length of delay neutrally because, as a murder case, the matter was complicated, or at least intermediately complex, and the March 2001 trial date only exceeded one year by a few days.  She also weighed the reasons for the delay neutrally because some of the delay was caused by crowded court dockets and thereafter the defense took no position on the first motion for extension and joined in the second motion. She weighed the assertion of the right against defendant because he filed the motion on the eve of trial.  She believed the prejudice factor was close, but weighed it against the defense because the "prejudice" flowing from Ruthie's homelessness, illness and death occurred before the agreed December setting, yet counsel made no effort to preserve the testimony of a homeless person who was ill, and the defense had located witnesses who could testify to what Ruthie would have said.  *See Tape Log/Tape* (3/6/01).

[21]  *See e.g., Castro v. Ward,* 138 F.3d 810, 819 (10th Cir.) ("only if the period of delay is 'presumptively prejudicial' need we inquire into the other factors. . . .  We have declined to draw a bright line beyond which pretrial delay will trigger a *Barker* analysis. . . .  We have found that delays of approximately five and one-half months, eight months, and thirty months not presumptively prejudicial, while we have held that a fifteen month delay was presumptively prejudicial.") (internal quotations and citations omitted), *cert. denied,* 525 U.S. 971 (1998).

[22]  The trial judge followed the analysis set forth in *State v. Ortiz-Burciaga,* 128 N.M. 382, 993 P.2d 96 (N.M. Ct. App. 1999), which in turn applies the factors outlined in *Barker v. Wingo,* 407 U.S. 514 (1972).  *See Ortiz-Burciaga,* 128 N.M. at 389-90, 993 P.2d at 103-04.  The New Mexico Court of Appeals specifically cited *Barker.  See e.g, Exhibit F* at 5.

**(4)  Result After Balancing The *Barker* Factors Was Not "Contrary" Or "Unreasonable"**

The New Mexico Court of Appeals found the case to be of intermediate complexity and the delay presumptively prejudicial, requiring it to balance the other *Barker* factors.  It weighed the reason for the delay neutrally for the same reasons as the trial judge.  *See supra,* note 20.  It weighed assertion of the right neutrally because defendant did not promptly move for a trial, as opposed to moving to dismiss the charges.  *Exhibit F* at 5-7.  And, unlike the trial judge, it found no prejudice to LaVoy (either due to Ruthie's death or to having been in custody from arrest to trial) because "Defendant failed to object to a continuance of a timely trial date" and "the prejudice suffered by Defendant" was not attributable to a "late trial date."  *Id.* at 7.

I do not find that the result reached by the state court under the balancing test was contrary to or an unreasonable application of Supreme Court precedent.  It identified the *Barker* factors and weighed them.  There is no assertion that the facts underlying its decision were erroneous.  Having weighed the four *Barker* factors, the court did not apply a rule that contradicts governing law.  The Supreme Court has never issued a decision involving materially indistinguishable facts to the LaVoy speedy trial issue.  Indeed, in the absence of any such decision, because the *Barker* balancing test does not establish a bright line rule and decisions under it are reached on an *ad hoc* basis, simply identifying the *Barker* factors and analyzing them based on nonerroneous facts appears to complete the inquiry under either the "contrary to" or "unreasonableness" prongs of AEDPA.[23]

---

[23]  *E.g., McPherson v. Miers,* 7 Fed. Appx. 845, 847 (10th Cir. 2001) ("We find that, in relying on *Barker,* the state court applied the correct rule of law, that it weighed the *Barker* factors in a reasonable fashion, and that, as a consequence, the delay did not violate Mr. McPherson's right to a speedy trial.");

Alternatively, I cannot conclude that where the state placed the balance was an unreasonable application of Supreme Court precedent.  In essence, the New Mexico Court of Appeals found that with all other factors not weighing heavily against the State, two other circumstances (Petitioner failed to object when the he was "bumped" from the original trial date and getting bumped did not cause Ruthie's death) tipped the balance against Petitioner.

On the one hand, the Supreme Court in *Barker* stated that the possibility a delay will impair a defense is the "most serious" interest protected by the right to a speedy trial "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system," and that "[i]f witnesses die or disappear during a delay, the prejudice is obvious." *Barker,* 407 U.S. at 532.  On the other hand, I have not found a Supreme Court post-*Barker* decision holding that the death of a defense witness establishes prejudice, and that the prejudice factor alone is sufficient to establish a violation of the right to a speedy trial.[24]  To the contrary, the *Barker*

---

*see also Danks v. Davis,* ___ F.3d ___, 2004 WL 94047 (7th Cir. 2004) (petitioner argued prejudice factor should have been balanced in his favor; court indicated that it would not reweigh the factors stating that in light of AEDPA standards "this court reviews whether the state court applied the correct law, not whether in applying the law it reached the correct decision," and alternatively found that its own view of the proper balance of the factors "nonetheless failed to establish that the court should have weighed the prejudice factor in his favor"); *Davis v. Kelly,* 316 F.3d 125, 127 (2nd Cir.) (assuming for purposes of argument that there was actual prejudice, finding state court result reasonable because "[b]alancing the *Barker* factors necessarily requires a court to make discretionary judgments" and it was not unreasonable for a state court to conclude that petitioner's role in causing delay outweighed any prejudice from certain testimony), *cert. denied,* 124 S. Ct. 414 (2003); *Rashad v. Walsh,* 300 F.3d 27, 45 (1st Cir. 2002) (in deciding whether state court's balance of the *Barker* factors was reasonable, noting that "AEDPA requires that we cede substantial deference [and] [t]his deference is heightened in a *Barker*-type case, because constructing a balance among the four factors 'is more judicial art than science'" and noting that, while finding it "disconcerting" that state court did not explicitly discuss the fact most favorable to petitioner, it "is not our function . . . to grade a state court opinion as if it were a law school examination") (internal citation omitted), *cert. denied,* 537 U.S. 1236 (2003).

[24]   In a pre-*Barker* case, the Supreme Court vacated a state court judgment and dismissed any criminal charges based on that judgment.  *Dickey v. Florida,* 398 U.S. 30 (1970).  The facts of that case were egregious.  There the "petitioner was available to the State at all times during the seven-year period

opinion makes clear that the factors themselves have "no talismanic qualities" and none of the

factors are "either a necessary or sufficient condition to the finding of a deprivation of the right of

a speedy trial." *Id.* at 534.  Instead, "courts must . . . engage in a difficult and sensitive balancing

process." *Id.*

Because it engaged in the balancing process and assigned different weight to different

factors, I cannot conclude that the New Mexico Court of Appeals' decision on the speedy trial

claim, or the trial court's resolution of the related ineffectiveness claim, was "objectively"

unreasonable,[25] even if I were to independently conclude that the decision was incorrect.[26]

---

before his trial" and diligently and repeatedly attempted to secure a speedy trial during that period.  During
the interval, "two [alibi] witnesses died" and another was allegedly unavailable.  Also, the State lost or
destroyed police records.  *Id.* at 36.  The delay was not attributable to "[c]rowded dockets, the lack of
judges or lawyers," but rather, "exclusively for the convenience of the State."  *Id.* at 38.

[25]   *C.f., Lockyer v. Andrade,* 538 U.S. 63, 75-76 (2003) (noting that the "precise contours" of the
governing legal principle of "gross disproportionality" are "unclear" and "gives legislatures broad
discretion to fashion a sentence that fits" within the principle; holding that it was not an "unreasonable
application . . . for the California Court of Appeal to affirm Andrade's sentence of two consecutive terms
of 25 years to life in prison" under this law).

[26]   In fact, I do not find the state court's result erroneous because I would also find no violation of
the constitutional right to a speedy trial were I to decide the issue independently.  I would first find that a
delay of one-year and twenty days is insufficient to trigger the other *Barker* factors and alternatively that
the balance tips in favor of finding no violation.  The State did not intentionally delay the first trial setting
to gain a tactical advantage, so that factor weighs against the State but not heavily.  Although Petitioner
claims that upon incarceration he asked his attorney to file a motion for a speedy trial, *see Doc. 1* at 10A, it
would have made no sense for counsel to have done so and participate in a trial sooner than September
because he and his investigator were having trouble locating homeless witnesses during the summer.  The
only arguable place where counsel first failed to assert the right was when it was apparent that the first trial
would be bumped.  Of course, neither he nor anyone else had reason to believe Ruthie would die before the
next-scheduled trial.  (Tellingly, nowhere here or in the state proceedings did Petitioner claim that he
insisted on going to trial in September, when it was evident that the trial would be bumped.)  Therefore,
assertion of the right weighs against Petitioner and weighs heavily, but does not amount to ineffective
assistance of counsel.  *E.g., Barker,* 407 U.S. at 532 ("failure to assert the right will make it difficult for a
defendant to prove that he was denied a speedy trial."); *United States v. Gomez,* 67 F.3d 1515, 1522 (10th
Cir. 1995) ("he never asserted his right to a speedy trial. . . .  As such, this factor weighs heavily against
Petitioner.), *cert. denied,* 516 U.S. 1060 (1996).  The final factor – prejudice – does not tip the balance in
my opinion under the circumstances of this case.  As discussed *supra,* at § IV.C., Ruthie's testimony could

Accordingly, I find the speedy trial claim without merit.

## B.  Alleged Miranda Violation

After taking a polygraph test and being told he failed, Petitioner made his second statement to police where he admitted striking Stoney with a rock.  He moved to quash that statement on the grounds that he was not advised of his *Miranda* rights either before taking the polygraph or giving his statement, and that he did not did not knowingly and voluntarily waive his right against self-incrimination.  Here, Petitioner reiterates his claim that failing to suppress the statement violated his constitutional rights.  *See Doc. 1* at 10A; *Exhibit D* at 1-4; *Exhibit I* at 2C.

The trial judge denied the motion and based her decision on two alternative grounds.  As to her first ground, she held that LaVoy was not in custody when he gave his inculpatory statement because Petitioner subjectively believed that he was free to leave.  Thus, she implicitly held that *Miranda* warnings were not required in the first instance.  *See Record Proper* at 109; *Tape Log/Tape 3/6/01.*  In the alternative, Judge Martínez found that adequate *Miranda* warnings were given and that LaVoy  knowingly and voluntarily waived those rights.

The New Mexico Court of Appeals affirmed without clearly distinguishing between the two alternative legal grounds for the decision, premising its decision on the finding the evidence was conflicting, the trial judge made a credibility determination, and that there was evidence to support the trial judge's findings.  *See Exhibit C* at 2-3; *Exhibit F* at 3-5.  The Court of Appeals

---

corroborate Petitioner's defense, yet he admitted she was not an eyewitness to the actual fight.  And, even though the trial judge limited the scope and time frame of what could be raised, she did not foreclose the defense.  As further discussed in that same section, the defense had witnesses lined up for trial.  Finally, while LaVoy, "undoubtedly experienced concern and anxiety over his impending trial, he has not alleged any special harm suffered which distinguishes his case from that of any other arrestee awaiting trial."  *See United States v. Dirden,* 38 F.3d 1131, 1138 (10th Cir. 1994).

relied solely on the parties' written submissions and the trial judge's written decision. Unfortunately, none of those written documents fully memorialize what was presented and decided at the evidentiary hearing. The audiotapes now having been thoroughly reviewed, I base my review on what transpired at the evidentiary hearing.

### (1) The Trial Court Failed to Address "Custody" As An Objective Test

A person is not necessarily "in custody" simply because they are the focus of a criminal investigation and the police interview them. *E.g., California v. Beheler,* 463 U.S. 1121, 1124 n.2 (1983) (per curiam) (citing *Beckwith v. United States,* 425 U.S. 341, 347 (1976)). However, if officers take a suspect into custody and thereafter initiate questioning, they are constitutionally-required to give the suspect *Miranda* warnings. *E.g., Dickerson v. United States,* 530 U.S. 428, 435 (2000). Whether a person is in custody is an ***objective*** test – that is, whether under the totality of the circumstances a reasonable person would believe that he or she was not free to leave. *E.g., Thompson v. Keohane,* 516 U.S. 99, 112 (1995); *State v. Munoz,* 126 N.M. 535, 554, 972 P.2d 847, 856 (N.M. 1998) ("The test is objective: the actual subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir. 1996)). Although the state courts did not employ an objective test, I need not analyze that aspect of their decisions under AEDPA because the trial judge's alternative holding is dispositive of the claim before me.

### (2) Factual Background Regarding Alternative Holding

At approximately 3:00 p.m. on the afternoon of February 21st, Petitioner and Ruthie went to the police station to retrieve his backpack, which was voluntarily given to officers the previous day. They took the backpack and left the station. There is no dispute that sometime thereafter

36

the officers went looking for Ruthie and Petitioner and asked them to come back to the station.

Petitioner's written assertions and oral assertions at the evidentiary hearing were different in some respects.  For the purposes of this discussion, I recount the position he took during the hearing.  Petitioner testified that the events took place according to the following time line and according to the following manner:

(1) he had been drinking the day he returned to the station;

(2) he only agreed to go back after an officer said something to the effect "don't make this hard, I'll arrest you if I have to;"

(3) he sat for "hours" in a courtyard between being taken back to the station and the polygraph test;

(4) he asked for an attorney "several times"  while they were talking;

(5) he only agreed to take a polygraph test after the officers informed him that he had been identified from photographs;

(6) he was not read his *Miranda* rights before taking the polygraph test;

(7) he thought that the polygraph equipment looked "fake," but admittedly had never taken one before;

(8) he sat for "hours" between the polygraph test and his subsequent statement;

(9) he was not read his *Miranda* rights before giving his statement; and

(10) he was not given a *Miranda* waiver sheet to sign until after he gave his statement, that is, when he was being booked.

*See Record Proper* at 69-70; *Tape Log/Tape (03/06/01).*[27]

---

[27]  In his written motion, Petitioner specifically claimed that he voluntarily returned to the police station.  He did not assert that he was coerced into taking a polygraph test or that he ever requested an attorney.  He also claimed that he was "tricked" into giving his statement because: (1) the polygraph test was "pretend," but the officers told him he failed it; (2) the officers told him that if they did not give a statement they would charge Ruthie with murder; (3) they knew he was simply defending himself; and (4) the most he would be charged with was manslaughter.  *See Record* at 69-70.

The officers testified that:

(1) after Petitioner and Ruthie left the station earlier that day, the officers learned that the Albertson employee had identified Plaintiff, so they went to find him and Ruthie;

(2) upon returning to the station, they separated the two and told Petitioner they had "additional incriminating evidence" and asked him to take a polygraph;

(3) Petitioner told them he had only ingested two beers "that morning," and did not appear to be, or behave as though, intoxicated or impaired at any time;

(4)  Petitioner never asked for an attorney;

(5)  Petitioner was read his *Miranda* rights, and signed a waiver form before taking the polygraph test, which was a bona fide test, and which indicated deceit;

(6) while Petitioner was taking the polygraph test, Ruthie told them that Petitioner admitted hitting Stoney;

(7) at the conclusion of the polygraph and scoring, the officers informed Petitioner that he had failed the polygraph, they had an eyewitness to the assault, and Ruthie told them Petitioner admitted hitting Stoney; therefore it would be a "good idea" for him to "come clean" by making a statement and Petitioner agreed;

(8) Petitioner was again read his *Miranda* rights before giving his statement; and

(9) Petitioner was free to leave at all times, as he acknowledged on tape at the end of this statement.

*See Record Proper* at 84-85; *Tape Log/Tape (03/06/01).*  The State did not present any evidence concerning the circumstances surrounding Petitioner's return to the station because the written motion did not challenge the voluntariness of that action.

The trial judge asked several questions to clarify when each event took place obviously seeking to clarify Petitioner's assertion that he was at the station for "hours."   Although the information she elicited from the officers was not entirely clear when Ruthie and Petitioner arrived at the station for the second time, it had to be well after 3:00 p.m. based on their prior visit to the

station.  The officers also testified that the polygraph was administered between 5:00 p.m. or 5:30

p.m.; it lasted approximately an hour or a little more from the *Miranda* warnings and pretest

procedures through the actual test and scoring; a "few minutes" elapsed between the conclusion

of the polygraph and the re-interview; and the taped statement began at 8:00 p.m.  *See Tape*

*Log/Tape (03/06/01).*

The trial judge also questioned the officers in much detail on the point of whether

Petitioner was read his rights because the signed waiver was introduced as evidence, but

apparently was not dated or time-stamped.  Also, the tape recordings of both the polygraph test

and the statement did not record them informing Petitioner of his rights.  In response to the

judge's questions as to why the *Miranda* portions of their discussions with Petitioner were not

memorialized, the officer who administered the polygraph explained that his failure to have the

tape running or to re-*Mirandize* on tape was an oversight.  Nevertheless, it was his practice to

*Mirandize* the person, have them sign the waiver, and make a copy of the signed waiver for his

files.  The copy of the signed waiver introduced as evidence was the one from the polygrapher's

file.  The officer who took the statement also appeared to indicate that his failure to memorialize

on tape was also an oversight; he did not have Petitioner sign another waiver because he knew it

was the polygrapher's practice to do so.  He did, however, conclude the tape of his interview of

Petitioner by recording on tape Petitioner's acknowledgment that he knew he was free to leave at

any time and that he was giving the statement voluntarily.  *See Tape Log/Tape (03/06/01).*

**(3)  Advisement And Voluntariness Findings Turn On Credibility Determinations**

Whether and when Petitioner was advised is a pure question of fact and thus is presumed

correct under § 2254(e)(1) unless a petitioner presents "clear and convincing" evidence to the

contrary. *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003). The "voluntariness" of a waiver is a mixed question of law and fact and is thus reviewed under the AEDPA "contrary to" and "unreasonable application" standard in § 2254(d)(1), with "any subsidiary factual findings made by the state trial court at the conclusion of the pretrial hearing . . . entitled to a presumption of correctness under section 2254(e)(1)." *Mitchell v. Gibson,* 262 F.3d 1036, 1059 (10th Cir. 2001); *see also Blythe v. Fatkin,* 64 Fed. Appx. 141 (10th Cir. 2003); *Johnson v. Zavaras,* 1998 WL 141968 (10th Cir. 1998).

Several critical factual findings form the basis for the trial judge's decision. Citing the trial judge's written opinion, the New Mexico Court of Appeals concluded that the Judge Martínez credited the State's witnesses.[28] The credibility determination is one that this Court recognizes in federal habeas review.[29] While the deference afforded state factual determinations "does not imply abandonment or abdication of judicial review. . . . [a] federal court can disagree with a state court's credibility determination," only if it does so "guided by AEDPA" standards. That is, under the § 2254(e)(1) presumption of correctness. *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003).

---

[28]   *See Exhibit C* at 2 ("The trial court weighed the conflicting versions of the facts and believed the State's version of the facts." ); *see also Exhibit F* at 4 ("In our notice of proposed disposition, we reasoned that the trial court weighed the conflicting versions of the facts and found the State's version more credible.").

[29]   *See, e.g., Smith v. Gibson,* 197 F.3d 454, 459 (10th Cir.) ("The Oklahoma Court of Criminal Appeals implicitly found Dickson's testimony credible," citing *Marshall v. Lonberger,* 459 U.S. 422, 433-34 (1983) for proposition that "even though state court did not make express credibility finding, federal court could assume state court found petitioner not credible, in light of that court's ruling" and *Newsted v. Gibson,* 158 F.3d 1085, 1091 (10th Cir. 1998), *cert. denied,* 526 U.S. 1093 (1999) for proposition that "deferring to implicit findings underlying state appellate court's determination that circumstances of case did not warrant giving lesser included offense instruction"), *cert. denied,* 531 U.S. 839 (1999).

Even though the trial judge did not specifically say she credited the State's version over Petitioner's, either in the written opinion or during the hearing, I cannot conclude that the appellate court's characterization of which evidence she credited is an "unreasonable determination of the facts."  What Petitioner presented by way of written motion and what he testified to at the hearing differed, and the officers' version of the facts, of course, differed from his.  The trial judge was thus required to decide which version she believed in rendering her decision.  There is no clear and convincing evidence that she credited anything other than the State's witnesses.  Her legal conclusions are consistent with the State's version of the operative facts.

At the hearing, the trial judge found that Petitioner waived any challenge to the voluntariness of his returning to the station for a second time or to the voluntariness of taking the polygraph because of the way the motion was written.  On the other hand, she also indicated that there was no evidence that at any time he wanted to leave or asked to leave.  She further indicated that the "courtyard" where Petitioner waited and was permitted to smoke was within the station but that it was not locked.  One could walk out of it and down the corridor to and out of the front entrance.  She found that Petitioner "was not threatened or coerced into going to the Las Cruces Police Department," "voluntarily agreed to take a polygraph examination," "was not intoxicated or impaired in any way," "was free to leave at any time . . . and admit[ted] he [was] speaking voluntarily to the detectives" as evidenced by his taped statement, and "was not [subjected to] a custodial interrogation" when he gave his statement, or if he was, he was "sufficiently and properly advised of his rights under *Miranda* and . . .  knowingly, voluntarily and intelligently waived those rights."  *See Record* at 108-09.

41

Like the "custody" question, voluntariness also depends on the "totality of the circumstances" and those circumstances include, among other things, "the crucial element of police coercion," the physical and mental health of the defendant, and whether the police advised the defendant of his *Miranda* rights. *Mitchell,* 262 F.3d at 1059 (quoting *Withrow v. Williams,* 507 U.S. 680, 693-94 (1993)). Even though the state court decisions did not acknowledge the applicable federal standard, it is evident that the trial court took the proper factors into consideration. Where a state court determines there is no coercion or impairment, and a proper advisement of rights, the decision is neither contrary to nor an unreasonable application of Supreme Court precedent. *E.g., id.; see also Blythe,* 64 Fed. Appx. at 145; *Johnson,* 1998 WL 141968 at *1 ("state court specifically found police witnesses were more credible . . . properly advised of his rights before making his statements . . . police made no threats or promises . . . . Because the state court found no threats or promises, involuntary confession claim fails and the finding that he was properly advised of his rights before making his statements disposes of his *Miranda* claim."). Accordingly, I find the *Miranda* claim is without merit.

## C. Evidentiary Rulings

Petitioner raises several issues relating to the evidence presented at trial and these issues generally fall into two broad categories: evidence that was admitted and evidence that was excluded. He also raises certain ineffectiveness issues related to these claims.

### (1) Evidence Admitted

In general, federal habeas relief will only be granted for evidentiary rulings that are "severely" prejudicial, thereby resulting in a trial that is fundamentally unfair. *E.g., Duncan v. Henry,* 513 U.S. 364, 369-70 & n.1 (1995); *Estelle v. McGuire,* 502 U.S. 62, 67-68, 75 (1991);

*Humphreys v. Gibson,* 261 F.3d 1016, 1022 (10th Cir. 2001).

### a. Calling Petitioner "Mr. LaVoy"

During his cross-examination of the State's witnesses and direct examination of Petitioner, by my count defense counsel addressed Petitioner by name sixteen times. During cross-examination, defense counsel referred to Petitioner as "Mr. LaVoy" five times, *Trial Transcript* at 127, 137, 138, 139; and as "Todd" once, *id.* at 125. On direct examination, he addressed Petitioner as "Mr. LaVoy" four times, *id.* at 146, 152, 156, 208; as "Todd LaVoy" four times, *id.* at 149, 166, 177, 184; and as "Todd" twice, *id.* at 146, 177. Indeed, even one of the prosecutors referred to Petitioner as "Todd," "Todd LaVoy," or "Mr. LaVoy," when she was not referring to him as "the defendant." *See id.* at 131, 132, 140.

At the conclusion of Petitioner's testimony and cross-examination, and ignoring her own co-counsel's conduct, one of the prosecutors asked the court during a sidebar conference to instruct defense counsel to refer to his client as "Mr. LaVoy." *Id.* at 240-41. This prosecutor stated that the court had admonished defense counsel to do so the day before, *id.* at 240, but I have been unable to find anything to that effect in my review of the record. Noting that the trial was a formal proceeding, the court asked defense counsel to refer to his client as "Mr. LaVoy." *Id.* at 241.

On direct appeal, counsel argued that the trial judge erred in so ruling because it "prevent[ed] humanizing of the defendant," *Exhibit B* at 10 (if numbered sequentially from cover page), and therefore evidenced "judicial bias" or a lack of impartiality on the part of the trial judge under state law, *Exhibit D* at 14-15. The New Mexico Court of Appeals held that the judge's ruling neither prejudiced Petitioner nor evidenced bias. *Exhibit F* at 11. Petitioner reiterates the

substance of this claim here.  *See Doc. 1* at 10D; *Exhibit I* at 2E-2F.

The trial judge's decision to require a certain level of decorum did not render the trial fundamentally unfair.  To the contrary, "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." *Illinois v. Allen,* 397 U.S. 337, 343 (1970).  Moreover, counsel's compliance with the ruling undoubtedly went unnoticed by the jury, since Petitioner had been referred to as "Mr. LaVoy" previously by both defense counsel and the prosecutor.

In addition, the "Due Process Clause clearly requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley,* 520 U.S. 899, 904-05 (1997) (internal quotations and citations omitted).  Thus, the Supreme Court has found a violation of due process in cases where it would be in a judge's "financial interest to find against one of the parties," where a judge sat "in a case in which one of the parties was a previously successful litigant against him," where a judge sat in a criminal case against a "defendant whom he had indicted," and indicated that due process would be violated in a case where the evidence showed that "a judge was disposed to rule against defendants who did not bribe him in order to cover up the fact that he regularly ruled in favor of defendants who did bribe him." *Republican Party of Minnesota v. White,* ___ U.S. ___, 122 S. Ct. 2528, 2535 (2002) (collecting Supreme Court cases).  Here, however, the trial judge's ruling evidences neither actual bias nor an interest in the outcome of the case.

Therefore, although the state court resolved the claims solely on the basis of state law, the result was neither contrary to nor an unreasonable application of Supreme Court precedent.

*b.  The "Rock"*

44

Petitioner contends that the trial court erred in allowing the State to introduce a rock as evidence of the murder weapon, that its introduction was erroneous as well as inflammatory and prejudicial, and that his attorney's failure to raise an objection to its introduction or lack of testing constitutes ineffective assistance of counsel.  The primary factual premise underlying this claim is Petitioner's assertion that the medical examiner testified he "seriously doubted" that this particular rock could have been the murder weapon.  *See Doc. 1* at 6; *Exhibit D* at 16, *Exhibit I* at 2A-2B, 2I.

In post-conviction proceedings, the state court addressed only the ineffectiveness aspect of the claim and did not consider separately whether the introduction of the rock rendered the trial fundamentally unfair.  It agreed with Petitioner's factual assertion, but found, in conclusory fashion, that counsel's failure to object was a trial tactic and Petitioner suffered no prejudice. *Exhibit J* at 1-2.  It thus in fact identified the *Strickland* standard in passing.

I find this entire claim utterly without merit for several reasons.  First and foremost, contrary to Petitioner's assertion, the medical examiner testified that Stoney suffered abrasions and head injuries, including a skull fracture with "considerable" bruising to the brain itself, in his "opinion there had to be at least two blows" made by a blunt object, such as the "rock" that consisted of an irregular piece of concrete he was shown at trial.  The expert testified, "Yes, that rock could have caused these injuries." *Trial Transcript* at 64; *see also id.* at 60, 62, 70.

Second, by Petitioner's own admission and as corroborated by both of the eyewitnesses, there was no dispute that he hit Stoney with a concrete "rock" the size of a "basketball."  Finally, the State's proffer of this particular exhibit as the murder weapon introduced some question about the credibility of the officers.  For example, on direct examination the officers admitted they did

not find the "rock" when they first investigated the scene.  After learning the medical examiner's

findings, the officers were instructed to return to the scene and look for a large rock.  The one

they subsequently seized purportedly contained blood and hair on it.  Defense counsel exploited

the opportunity by eliciting the fact that the officers did not send the evidence to the laboratory to

have these samples tested to see if they matched Stoney's hair and blood.  *See id.* at  105, 106,

125.

In short, whether or not the rock shown to the jurors was the actual murder weapon, its

introduction did not result in prejudice to Petitioner because the type of weapon, its size, and the

cause of Stoney's death was not in question.  As such, its introduction did not render the trial

fundamentally unfair, nor amount to ineffective assistance of counsel.  Consequently, the state

court's result was neither contrary to, nor an unreasonable application of Supreme Court

precedent.

### c.  Reading Eyewitness's Police Statement

As discussed above, the only eyewitness who positively identified Petitioner as the

assailant had lost her memory by the time of trial, and her taped statement to the police was read

verbatim to the jury by the prosecutors, with one reading the questions and the other the answer.

*See supra,* § IV(D).  In his counseled direct appeal, Petitioner argued that the trial judge erred in

allowing the statement to be read, claiming that the State carries the burden of establishing a

hearsay exception for admission and that the reading of the statement "dramatized" that

statement.  *See Exhibit B* at 10 (if numbered sequentially from cover page); *Exhibit D* at 14.  In

post-conviction proceedings and here, Petitioner adds that having one of the prosecutors sitting in

the stand "playing" the part of the witness and the other "playing" the part of the officer "lent

undue weight to the statement." *Doc. 1* at 7, 10C-10D; *see also Exhibit I* at 2B, 2E.

The New Mexico Court of Appeals found that the trial judge did not err because under one of its prior decisions "if a witness has no memory of a statement, it can be read into evidence if it complies with the requirements of an appropriate hearsay exception."  The statement at issue was found admissible, regardless of the availability of the declarant, as a recorded recollection or as a record of regularly conducted activity.  *Exhibit F* at 10 (citing evidentiary rules 11-803(E) and 11-803(F)).  Although the trial court specifically entertained a Confrontation Clause challenge to the admission of the evidence, *see Trial Transcript* at 77-78, the New Mexico Court of Appeals  did not analyze the claim under Sixth Amendment Confrontation Clause principles.  Nevertheless, those principles do not compel a different result.

"When the government seeks to offer a declarant's out-of-court statements against the accused, and, as in this case, the declarant is unavailable, courts must decide whether the [Confrontation] Clause permits the government to deny the accused his usual right to force the declarant to submit to cross-examination."  *Lilly v. Virginia,* 527 U.S. 116, 124 (1999) (internal quotations omitted).  Until yesterday, under long-established Supreme Court precedent, such hearsay is admissible under two circumstances:  either when it "'falls within a firmly rooted hearsay exception'" or when it "contains 'particularized guarantees of trustworthiness.'"  *Id.* at 125 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66 (1980)).

The two exceptions that the New Mexico Court of Appeals identified – recorded recollection and records of regularly conducted activity – are the same as federal hearsay exceptions codified at FED. R. EVID. 803(5) and 803(6).  There is no dispute that a witness' recorded statement to the police during an investigation falls under both of these exceptions, and I

47

find that it indeed falls under both.  Although the Supreme Court has not decided whether those two rules are "firmly rooted" hearsay exceptions, other courts, including the Tenth Circuit, have so held.  *See Hatch v. State,* 58 F.3d 1447, 1467 (10th Cir. 1995) (statement given to police falls within past recorded recollection and is a firmly rooted hearsay exception); s*ee also Flood v. Phillips,* 2004 WL 193164 at * 8 (6th Cir. 2004) (business records exception is firmly rooted hearsay exception, citing *United States v. Waters,* 158 F.3d 933, 940-41 (6th Cir. 1998)).  Thus, the admission of the statement was consistent with Confrontation Clause jurisprudence as it stood at the time of the state court decisions.

The Court's decision in *Crawford v. Washington,* ___ S. Ct. ___, 2004 WL 413301 (March 8, 2004), muddies these waters.  The decision, however, does not compel a different result in this case.  First and foremost, it was not decided at the time the state courts issued their decision and was not held to apply retroactively.  Therefore, it does not provide "clearly established" Supreme Court precedent as that phrase is defined by AEDPA.  Second, the decision does not announce that it overrules *Roberts* in all respects, but does decline to apply the "trustworthiness" option in the context of "testimonial" statements at issue there.  Here, the statements fall within the "firmly rooted" hearsay objections prong.  Third, the decision characterizes statements made during "police interrogations" as "testimonial," but declined to issue a comprehensive definition of what constitutes a "testimonial" statement.  *See id.* at *19. The eyewitness statement here was not made during a police "interrogation" or "custody" in contrast to *Crawford,* where the wife of the defendant gave her statement to police after being given *Miranda* warnings.  *See id.* at *3.  As the opinion notes, "Sylvia Crawford made her statement while in police custody, ***herself a potential suspect*** in the case."  *Id.* at *17 (emphasis

48

added).  The statement here is thus arguably the type of "nontestimonial hearsay," to which the

*Crawford* opinion indicates a *Roberts* approach would still apply, allowing the "states flexibility in

their development of hearsay law . . . that exempted such statements from Confrontation Clause

scrutiny altogether."  *Id.* at *19.  Finally, the *Crawford* decision makes no mention of the harmless

error doctrine.

Therefore, alternatively, even if admission of the statement did amount to a constitutional

violation, its admission was "harmless beyond a reasonable doubt."  *See Lilley,* 527 U.S. at 140

(quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)).  The statement was cumulative of the

other eyewitness statements and, rather than providing an identification of Petitioner's face, ***failed***

to positively identify him.  As such, Petitioner's claim that counsel was ineffective in failing to

challenge whether the eyewitnesses had been shown a photo array or a single picture also fails.

*See Exhibit D* at 16; *Exhibit I* at 2I.

Finally, I have found no decision, much less Supreme Court precedent, that forbids the

practice of prosecutors reading a statement in question and answer format as a matter of federal

due process.  True, Defense counsel had no objection to the prosecutors reading the statement,

*Trial Transcript* at 83, and the court did not give an instruction to the jury about the procedure,

*see id.* at 84, 89, 130-47.  Nevertheless, I find that presenting the statement to the jury in that

fashion did not render the trial fundamentally unfair.  That format is a common way to present

written testimony, and is easier for the jury to follow.  Moreover, there was concern that the

witnesses' neurological damage would effect her ability to read the statement aloud clearly.  *See*

*Trial Transcript* at 78-79.

## (2)  Exclusion Of Defense Evidence

49

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontations clauses of the Sixth Amendment" [the Constitution] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 486 (1984)); *see also e.g., United States v. Scheffer,* 523 U.S. 303, 308 (1998) (citing, among other decisions, *Rock v. Arkansas,* 483 U.S. 44, 55 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973); and *Washington v. Texas,* 388 U.S. 14, 23 (1974)). The same is true and well-established under state law. *See State v. Stanley,* 131 N.M. 368, 375, 376, 37 P.3d 85, 92, 93 (N.M. 2001) ("When a substantial right of a party is affected, evidence may not be excluded;" "The denial of an opportunity for Defendant to develop a major part of his defense was an abuse of discretion.").

Petitioner claims that Judge Martínez erred in disallowing statements Ruthie made to others, in imposing a three-year limitation for Stoney's bad acts, in disallowing telephonic testimony, and allowing the prosecution to "continually quote" Ruthie's excluded statements. Having read the transcript, I am not sure what LaVoy means by "continually quoting" her statements, unless he is referring to the one time during cross-examination when the prosecutor inquired of LaVoy about his relationship with Ruthie. *See Trial Transcript* at 211-12.

In any event, the constitutional point of Petitioner's arguments is clear. He contends that the trial judge's rulings precluded unfavorable testimony about Stoney as well as favorable testimony about Ruthie's fear of him. These exclusions are alleged to have impermissibly infringed on his ability to mount a defense. *See Doc. 1* at 9, 10B-10C; *Exhibit D* at 10-13; *Exhibit I* at 2B-2E, 2I. Instead of recounting the various rulings by the New Mexico Court of

Appeals, which focused exclusively on whether the trial judge's evidentiary rulings were correct, I jump right to the constitutional heart of the matter.

The right to present a defense "is not unlimited, but rather is subject to reasonable restrictions." *Scheffer,* 523 U.S. at 308. Supreme Court precedent does not "stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence." *Id.* at 316. So, for example, the Court has held it is not unconstitutional for a state to enforce the discovery sanction of prohibiting a nondisclosed defense witness from testifying. *Taylor v. Illinois,* 484 U.S. 400, 404, 411-12 (1988) (witness did not see incident itself but had observed events preceding the actual shooting that would have been favorable to the defense).

The only instances where the Supreme Court has found exclusions of evidence to impermissibly impinge on the constitutional right to present a defense are where an evidentiary statute or rule precluded certain types of testimony that, as applied in the circumstances of the particular case before it, directly related to the issue of whether the defendant was the person who committed the crime.[30] In *Chambers,* for example, a combination of a rule preventing a party

---

[30]   In *Rock,* a rule excluding all hypnotically refreshed testimony resulted in the jury hearing no testimony from the defendant, the sole eyewitness to the scene. 483 U.S. at 57 (application of the rule "virtually prevented [defendant] from describing any of the events that occurred on the day of the shooting, despite corroboration of many of those events by other witnesses"). In *Washington,* a statute forbidding all co-defendant/accomplice testimony resulted in the jury not hearing testimony from an accomplice that the accomplice in fact committed the crime. 388 U.S. at 16, 21 (accomplice would have testified that the defendant tried to prevent the accomplice from shooting and ran off before the fatal shot was fired; noting that common-law rule providing co-defendants were incompetent to testify had long been rejected ). Likewise, a trial judge's "threatening remarks, directed only at the single witness for the defense" that resulted in that prisoner witness not testifying, resulted in a denial of due process. *Webb. v. Texas,* 409 U.S. 95, 96-97 (1972). In a case where the prosecution rested "almost entirely on petitioner's confession," the Court held the state court could not foreclose a defendant's efforts to introduce evidence about the voluntariness of the confession. *Crane,* 476 U.S. at 690-91. And, in *Green,* the state court did not permit the introduction of hearsay during the penalty phase of a capital case where the witness would have

from impeaching his own witness and the hearsay rule that did not recognize statements against

penal interest as an exception, resulted in the jury not hearing that a witness in fact confessed to

committing the crime.  410 U.S. at 287-88 (witness made a written confession, later repudiated it,

but on three occasions to separate people admitted to killing the victim).

Here, however, the excluded evidence Petitioner wanted to introduce was not to establish

that someone else killed Stoney, but to corroborate his testimony that Stoney was the initial

aggressor and that Petitioner simply defended himself and Ruthie.  The Supreme Court's decision

in *Scheffer* addressed an analogous situation.  There a defendant to a court martial proceeding for

taking drugs successfully passed a polygraph test where he indicated that he had not taken drugs

and was not lying.  Later test results showed drugs in his system.  At the court martial, his defense

was "innocent ingestion," and he wanted to introduce the positive polygraph test to corroborate

his own testimony.  *See* 523 U.S. at 306-07.  Eight members of the Court joined in the portion of

the opinion that refused to hold unconstitutional a military rule of evidence that precludes the

introduction of polygraph testimony.  That portion of the opinion reasoned that the evidentiary

rule

> does not implicate any significant interest of the accused.  Here, the
> [military tribunal] *heard all the relevant details of the charged offense*
> *from the perspective of the accused, and the Rule did not preclude him*
> *from introducing any factual evidence.  Rather, respondent was barred*
> *merely from introducing expert opinion testimony to bolster his own*
> *credibility* [and] did not prohibit respondent from testifying on his own
> behalf; he freely exercised his choice to convey his version of the facts to
> the [tribunal].  We therefore cannot conclude that respondent's defense
> was significantly impaired by the exclusion of polygraph evidence.

*Id.* at 317 (emphasis added).

---

testified another confessed to the killing.  *Green v. Georgia,* 442 U.S. 94, 96 (1979) (per curiam).

As in *Scheffer,* the trial judge's evidentiary rulings here did not preclude Petitioner from presenting his defense to the jury.  As noted above in § IV(C), Petitioner could testify about Stoney's prior conduct toward Ruthie as he understood it, and he did, testifying about her asserted attempted rape, beatings, and stalking.  *See supra* § IV(B)(4).  Dehringer also testified that Petitioner was concerned for Ruthie's safety – "Todd LaVoy seemed concerned about the safety of his girlfriend and tried to keep some distance between" Stoney and Ruthie.  *Trial Transcript* at 246.  Therefore, the rulings did not unfairly or unconstitutionally deprive defendant of his defense.

Most importantly though, even if the jury credited all of the testimony about violence, aggression, stalking, fear, and the evidence that Stoney threatened Ruthie and started the fight with Petitioner, it could still find Petitioner guilty of second degree murder.  The uncontradicted evidence, primarily by way of Petitioner's own testimony, was as follows:  their tent was located behind a building at an intersection in Las Cruces that is a heavily congested business district; Ruthie fled the scene to the safety of the tent prior to the altercation; Stoney did not try to stop her from doing so; Petitioner successfully knocked Stoney to the ground without the aid of the rock; Petitioner hit Stoney with the rock while Stoney was still on the ground; and  Petitioner hit him a second time as he lay there.  Except for the nature of the area, which would have been obvious to any juror from the testimony, at the time the fatal blows were delivered there was an absence of provocation or justifiable fear for his or Ruthie's safety.[31]  Those facts are crucial and

---

[31]  As the prosecution stressed in closing argument:

> He says he punched him and he kicked him, and [Petitioner] has a split lip. The victim [Stoney] by [Petitioner's] own statement, is using nondeadly force.  He is using his fist and maybe kicking him.  What does he do in

sufficient to support the jury's verdict. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (test

for sufficiency is "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt.") (emphasis original).

## D.  Remaining IAOC & New Trial Claims

Petitioner raises a vague claim, apparently that counsel was ineffective in failing to

challenge the fact that the police did not take his clothes for testing. *See Exhibit D* at 16; *Exhibit*

*I* at 2I. This claim is frivolous. Defense counsel established on cross-examination that

Petitioner's clothes were not taken until after he was arrested and then were not sent for testing.

In any event, there was no dispute that Plaintiff's clothes were not bloody. *See Trial Transcript*

at 128-29, 134-35.

Petitioner also faults counsel for failing to investigate a potential witness who had been

drinking with them that day. This claim too is frivolous. LaVoy readily admits that this witness

---

> return? In the Third statement, he pushes [Stoney]. What is the next
> step? It's not a clocking, nick you out. It is not a kick to the gut while he
> was on the ground and incapacitated. We go from a push to a rock.
> [Petitioner] smashes [Stoney's] head in. That's not even force. That is
> raising the level of the interchange, if you believe that statement. [The self
> defense instruction] is not available to the defendant [because] You have a
> victim who is not using deadly force, which would not ordinarily crate a
> potential risk of death or great bodily harm, and you have the defendant
> responding with force, which would ordinarily create a substantial risk of
> death or great bodily harm. [As for defense of others, the State] would
> submit regardless of which [of Petitioner's] statements you look at, none
> of them support this instruction at all. . . . By his own [testimony], he
> does not meet the elements of this defense. He never says, I had to kill
> [Stoney] because I knew he would have killed Ruthie. He doesn't say
> that. He says he doesn't know what he meant. That, ladies and
> gentlemen, is not enough to meet defense of another."

*Trial Transcript (Vol II)* at 22 - 24.

was approximately ninety feet from the location were the fight took place and was not an eyewitness to the altercation. *See Exhibit I* at 2I-2J.

According to Petitioner, counsel subpoenaed Olmsted, Brown and Beavins for trial, but told Petitioner that they had departed the courthouse, unwilling to testify. LaVoy contends that later he learned that defense counsel had "inferred" [sic] to them that they should leave. *Exhibit I* at 2J. He also contends that counsel was ineffective for failing to subpoena the witnesses that he brought in to make statements before sentencing. *Id.* Those included Stoney's mother, brother and friend, who collectively informed the court that Stoney was violent when drunk, infatuated with Ruthie, and that her brother defended her against Stoney on one occasion. Ruthie's sister related that Ruthie told her Stoney raped and stalked her. Petitioner's mother and stepfather indicated that Petitioner is a good, peaceful and bright person but falters when he drinks and hangs around with the wrong people *See Tape Log/Tape (6/27/01).* LaVoy further contends that the testimony of the sentencing witnesses constitutes "new evidence" that warrants a new trial . *Doc. 1* at 10E; *Exhibit I* at 2G-2H

Yet their testimony was not new, would have been cumulative, and the jury could have reached the verdict it did even if it believed the violence/fear testimony. Petitioner simply fails to establish any prejudice by the absence of those witnesses from trial. I have found no clearly established Supreme Court precedent that finds a new trial is constitutionally required under these circumstances.[32] For all these reasons, I find that the state court result was not contrary to or an

---

[32]   The Supreme Court has held that a new trial is constitutionally required is where the State knowingly uses perjured testimony, fails to correct testimony it knows to be false, or suppresses favorable evidence in order to secure a conviction. *See, e.g., Napue v. Illinois,* 360 U.S. 264 (1959)*; Pyle v. State of Kansas,* 317 U.S. 213, 216 (1942)*; Mooney v. Holohan,* 294 U.S. 103, 112 (1935).

unreasonable application of Supreme Court precedent.

## E.  Cumulative Error

Petitioner maintains that the cumulative effects of the above alleged errors deprived him of a fair trial.  *See Doc. 1* at 10F; *Exhibit D* at 15; *Exhibit I* at 2H.  "Cumulative error is not a basis for granting habeas relief in non-capital cases.  *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.  Thus, it cannot be said that the judgment of the Ohio courts is contrary to . . . any . . . Supreme Court decision so as to warrant relief under the AEDPA.")."  *Eskridge v. Konteh,* 2004 WL 232150 at *8 (6th Cir. 2/3/04) (unpublished); *compare Darks v. Mullin,* 327 F.3d 1001, 1017-19 (10th Cir.) (declining to address *Lorraine* proposition when raised in a capital case), *cert. denied,* 124 S. Ct. 433 (2003).

Alternatively, for the reasons set forth above I find that any arguable error either individually or in the aggregate, did not have a "substantial" or "injurious effect" or "influence" on the jurors' verdict.  *Darks,* 327 F.3d at 1018; *see also Strickland,* 466 U.S. at 695-96.

## F.  Habitual Offender Statute

Petitioner contends that the New Mexico habitual offender statute violates due process, equal protection and cruel and unusual punishment because "[t]he mandatory requirements of [the] sentencing scheme is arbitrarily enforced, resulting in harsher sentences to persons who go to trial as opposed to no enforcement or application to many who plea bargain."  *Doc. 1* at 10E. He raised this claim in his state habeas petition.  *Exhibit I* at 2F-2G.  The trial judge denied the claim without discussing it.  *See Exhibit J* at 2.

The state court's result on this issue is not contrary to or an unreasonable application of

Supreme Court precedent.  It is well and long established that the Constitution does not require parity in sentencing for those who plead guilty and those who go to trial.  Indeed, a state can encourage pleas by providing more lenient sentences to those who do plead, and the practice, though it gives a defendant a hard choice to make, simply does not offend any constitutional principle.  *Corbitt v. New Jersey,* 439 U.S. 212, 220-26 (1978) (and other Supreme Court decisions discussed therein).

Wherefore,

**IT IS HEREBY RECOMMENDED** that the State's motion to dismiss *(Doc. 12)* be granted in part and this § 2254 petition dismissed with prejudice as without merit.

**IT IS FURTHER RECOMMENDED** that Petitioner's requests for an evidentiary hearing and for appointment of counsel *(Docs 17, 20)* be denied.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE